## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**PHILLIP JOSHUA KYLE BROOKS,**            *

      **Plaintiff,**            *

**v.**            *            **Civ. No. DLB-23-0208**

**ST. CHARLES HOTEL OPERATING,**            *
    **LLC.,** ***et al.,***
                                *

      **Defendants.**            *

                                          *

### MEMORANDUM OPINION

Phillip Joshua Kyle Brooks filed suit against the State of Maryland ("the State"), Charles County, Maryland ("the County"), St. Charles Hotel Operating, LLC d/b/a Hilton Garden Inn ("Hilton"), Officer Timothy McKimmie, and Sheriff Troy Berry alleging various constitutional and tort claims related to his October 2019 arrest at the Hilton in Waldorf, Maryland.  ECF 5; *see* ECF 6 (am. compl.).  Pending before the Court are the County and Sheriff Berry's and the State's motions to dismiss the amended complaint.  ECF 12 & 13.  The motions are fully briefed.  ECF 12-1, 18, 20 & 23 (the County and Sheriff Berry's motion to dismiss briefing); ECF 13-1, 19 & 24 (the State's motion to dismiss briefing).  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  For the following reasons, the State's and the County and Sheriff Berry's motions to dismiss are granted.

### I.      Background

The Court accepts the following well-pleaded facts as true on a motion to dismiss.  Brooks, a California resident, visited Maryland in October 2019 for a business conference and personal matters.  ECF 6, ¶¶ 11–12.  Brooks checked in to the Hilton in Waldorf, Maryland on October 9.

*Id.* ¶ 14.  When he arrived, the nighttime attendant, Leonard Lowery, initially did not allow him to enter the premises; he was eventually let in by another guest and checked in.  *Id.* ¶¶ 15–16.

The next night, Brooks and his colleagues socialized in a common area of the hotel.  *Id.* ¶ 21.  Although no one in the group was acting disorderly, Lowery approached the group and demanded that they leave.  *Id.*  The group, including Brooks, complied.  *Id.*  Later that evening, Brooks approached Lowery to ask for a complimentary water bottle.  *Id.* ¶ 22.  After Lowery refused, a brief verbal altercation ensued.  *Id.* ¶ 23.  Lowery threatened to call the police, and Brooks returned to his room.  *Id.*

At around 3:00 a.m., roughly 20 minutes after the verbal altercation, Brooks heard a knock at his door.  *Id.* ¶ 30.  Brooks partly opened the door, leaving the swing bar lock in place.  *Id.* ¶ 31.  "[F]our or five Charles County Sheriff's Office sworn deputies, including Officer McKimmie," were outside of his room.  *Id.*  ¶ 30.[1]  One of the officers allegedly told Brooks that if he did not open the door, he would be arrested for trespassing.  *Id.* ¶ 32.  Brooks replied that the Hilton had not asked him to leave or refunded his room.  *Id.* ¶ 33.  During the conversation, one of the officers used a key to unlock the door but was stopped by the swing bar lock.  *Id.* ¶ 34.  When Brooks began fully opening the door, an officer kicked the door in.  *Id.* ¶ 36.  The door hit Brooks in the face, and as he fell backwards, the officers grabbed him, wrestled him to the ground, and pressed on him to keep him face down on the floor.  *Id.* ¶¶ 37–38.  They handcuffed him.  *Id.* ¶ 38.  Brooks did not resist.  *Id.* ¶ 39.  He feared for his life and yelled for help.  *Id.* ¶ 40.

Brooks was detained overnight.  *Id.* ¶ 42.  The next day, he was escorted back to the Hilton by three officers to retrieve his belongings.  *Id.* ¶ 45.

---

[1]  The parties refer to McKimmie and the other deputies as "officers" and "deputies" interchangeably.  *See* ECF 3 (McKimmie's answer), 6, 12-1, 13-1.

Brooks was formally charged with disturbing the peace and trespass on private property. *Id.* On December 6, 2019, the criminal charges against Brooks were dismissed. *Id.* ¶ 49.

On October 3, 2022, Brooks filed this lawsuit, alleging various torts and constitutional claims against the defendants. The pending claims are: false arrest against Hilton and Officer McKimmie (Count 1); false imprisonment against Officer McKimmie (Count 2); excessive force under Article 24 of the Maryland Declaration of Rights against all defendants except Hilton (Count 3); excessive force and deprivation of liberty under Article 26 of the Maryland Declaration of Rights against all defendants except Hilton (Count 4); unconstitutional policy or practice under Article 26 against all defendants except Hilton (Count 5); battery against Officer McKimmie (Count 6); malicious prosecution against Officer McKimmie (Count 8); a violation of 42 U.S.C. § 1983 against Officer McKimmie in his individual capacity (Count 9); and a § 1983 claim against the County and Officer McKimmie and Sheriff Berry in their official capacities (Count 10).[2]

## II.    The State's motion to dismiss

The State moves to dismiss the claims against it (Counts 3, 4, and 5) for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and, in the alternative, for failure to state a claim under Rule 12(b)(6). "A motion to dismiss based on lack of subject matter jurisdiction pursuant to Rule 12(b)(1) raises the question of whether the Court has the competence or authority to hear the case." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). "Federal courts are courts of limited jurisdiction[,]" possessing "only that power authorized by

---

[2] In his opposition to the State's motion to dismiss, Brooks withdraws his 42 U.S.C. § 1983 claim against the State. ECF 19-1, at 2. That is wise: A state is not a "person" within the meaning of § 1983 and is not a proper defendant for that claim. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989). Brooks's § 1983 claim is dismissed as to the State. Brooks also previously voluntarily dismissed Count 7 of the amended complaint, which was a claim for intentional infliction of emotional distress against the Hilton and McKimmie. ECF 25.

Constitution and statute." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)).  Thus, "when a district court lacks subject matter jurisdiction over an action, the action must be dismissed." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006)).  A court should grant a Rule 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted).

A defendant may challenge subject matter jurisdiction in two ways: a facial challenge, asserting that the complaint fails to allege facts upon which jurisdiction can be based, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).  On a factual challenge, like the State's, if the contested "jurisdictional facts are intertwined with the facts central to the merits of the dispute," a court "should ordinarily assume jurisdiction and proceed to the intertwined merits issue." *Kerns*, 585 F.3d at 193.  But where the jurisdictional facts are not intertwined with facts central to the merits, the court "may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits," without converting the motion into one for summary judgment.  *United States ex rel. Vuyyuru*, 555 F.3d at 348 (citing *Adams*, 697 F.2d at 1219); *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004) (on a factual challenge to subject matter jurisdiction, the court "may regard the pleadings as mere evidence on

the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment").[3]

The State contends that the Court lacks subject matter jurisdiction because the State enjoys sovereign immunity.  A suit cannot be brought against the State or its agencies unless Congress has abrogated that immunity or the State has waived it.  *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020) (quotation omitted); *Stern v. Bd. of Regents, Univ. Sys. of Md.*, 846 A.2d 996, 1001 (Md. 2004) (noting that no contract or tort suit can be maintained against a state agency or actor unless "the General Assembly has specifically waived the doctrine [of sovereign immunity]").  "[A] state's removal of a suit to federal court waives sovereign immunity only if the state has consented to suit in its own courts."  *Biggs*, 953 F.3d at 241.  The Maryland Tort Claims Act ("MTCA") "provides a limited waiver of sovereign immunity and is the sole means by which the State of Maryland and its personnel may be sued in tort."  *Paulone v. City of Frederick*, 718 F. Supp. 2d 626, 637 (D. Md. 2010) (quotation omitted).  The MTCA "does not distinguish between constitutional torts and common law torts" and encompasses the state constitutional claims that Brooks asserts against the State.  *See Francis v. Maryland*, No. ELH-21-1365, 2023 WL 2456553, at *23 (D. Md. Mar. 10, 2023) (citing *Newell v. Runnels*, 967 A.2d 729, 763 (Md. 2009)).

However, the MTCA's waiver of sovereign immunity "is conditioned upon, *inter alia*, the injured party filing notice of its tort claim with the State Treasurer's Office within one year after the injury."  *Id.* (citing Md. Code Ann., State Gov't § 12-106(b)(1)).  Pursuant to § 12-106(b) of the MTCA, with exceptions discussed below,

---

[3] In *Adams* and its progeny, the Fourth Circuit has noted that the trial court may go beyond the allegations "and in an evidentiary hearing" determine if there are facts to support the plaintiff's jurisdictional allegations.  697 F.2d at 1219.  Neither party has requested an evidentiary hearing, and for the reasons explained below, a hearing would be unnecessary.

a claimant may not institute an action under [the MTCA] unless:

(1) the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim;

(2) the Treasurer or designee decides the claim finally; and

(3) the action is filed within 3 years after the cause of action arises.

Md. Code Ann., State Gov't § 12-106(b).  The notice requirement is "intended to 'afford[ ] the State the opportunity to investigate the claims while the facts are fresh and memories vivid, and, where appropriate, settle them at the earliest possible time.'" *Francis*, 2023 WL 2456553, at *24 (quoting *Haupt v. State*, 667 A.2d 179, 183 (Md. 1995)).  Filing notice with the Treasurer is "a condition precedent to bringing an action under the MTCA." *Gray v. Maryland*, 228 F. Supp. 2d 628, 641 (D. Md. 2002) (citations omitted).  Failure to provide the required notice "bars any suit against the State." *Daulatzai v. Maryland*, 606 F. Supp. 3d 252, 278 (D. Md. 2022) (quoting *Williams v. Md. Dep't of Hum. Res.*, 764 A.2d 251, 364 (Md. 2000)).

The parties dispute whether Brooks satisfied the MTCA's requirement to file a notice of claim with the Treasurer.  Brooks alleges that "[t]o the extent that Plaintiff's claims are governed by the notice requirements of the [MTCA] . . . Plaintiff provided such notice on March 30, 2020." ECF 6, ¶ 4.  The State contends it never received the notice. ECF 13-1, at 7.  Because this dispute regarding notice is not intertwined with facts central to the merits of Brooks's claims, the Court may consider the affidavits submitted by each party. *United States ex rel. Vuyyuru*, 555 F.3d at 348.  The State attaches to its motion to dismiss an affidavit from Joyce Miller, Director of the Insurance Division of the Maryland State Treasurer's Office. ECF 13-3.  Miller indicates that her division receives notice of claims submitted against the State and its personnel pursuant to the MTCA and keeps official records of such claims. *Id.* ¶¶ 3–4.  She states that she reviewed the official records and that her division has not received a notice of claim from Brooks. *Id.* ¶ 5.

Brooks, in response, attaches to his opposition a notice of claim letter dated March 30, 2020, addressed to the State Treasurer and signed by his attorney. ECF 19-4. He also attaches an affidavit of Tracy Henderson, his attorney's administrative assistant. *Id.* Henderson states that the letter is saved in the law firm's computer folder for Brooks's case and that "under the regular business practices of this firm . . . a signed PDF copy of a letter would not be saved to a file in the format and manner that this letter is saved to Plaintiff's file unless it was placed in the United States mail." *Id.* ¶ 5. Henderson also states that "the firm has been unable to locate a certified mail 'green card,'" which Brooks concedes would prove that the mailed letter had been delivered. *Id.*; *see* ECF 19-1, at 7. Brooks offers no evidence that the Treasurer received the letter.

The statute requires that Brooks "submit[] a written claim to the Treasurer." State Gov't § 12-106(b)(1). It does not specify whether the act of submission is complete upon mailing or upon actual receipt, and no case has addressed this precise set of facts. To determine the Maryland legislature's intent, the Court interprets the plain language of the statute using "ordinary, popular understanding of the English language." *Bd. of Educ. of Baltimore Cnty. v. Zimmer-Rubert*, 973 A.2d 233, 241 (Md. 2009). "Submit" means "[t]o bring (something) under a person's view, notice, or consideration; to refer (something) to a person's decision or judgement." Submit, Oxford English Dictionary (2023). This definition aligns with the other statutory condition precedent to suit, which is that the Treasurer must "decide[] the claim finally." State Gov't § 12-106(b)(2); *see Francis*, 2023 WL 2456553, at *24; *Haupt*, 667 A.2d at 183. The Treasurer cannot decide the claim finally if it does not receive the claim. Given the statutory language, the Court finds that when the Treasurer offers credible evidence, as here, that it did not receive the notice, merely mailing a claim—without proof of receipt—does not satisfy the statute's requirement of submission of a written claim within one year after the injury. Brooks did not comply with the

statutory condition precedent to filing a lawsuit.  *See Daulatzai*, 606 F. Supp. 3d at 278 (dismissing

tort claims against the State because the plaintiff did not provide timely notice of claims);

*MedSense, LLC v. Univ. Sys. of Md.*, No. PWG-20-892, 2021 WL 3142004, at *9 (D. Md. July 26,

2021) (dismissing tort claims against the State because the plaintiff "was required to submit its

written claim to the Maryland State Treasurer, or designee, within a year, but it did not").

The inquiry, however, does not end there.  Brooks argues that, under recent amendments

to the MTCA, a failure to provide proper notice to the Treasurer does not necessarily bar his claims.

The Maryland General Assembly amended the MTCA's notice requirement to include two

exceptions to a failure to submit a written claim:

> (1) If a claimant fails to submit a written claim in accordance with subsection (b)(1)
> of this section, on motion by a claimant and for good cause shown, the court may
> entertain an action under this subtitle unless the State can affirmatively show that
> its defense has been prejudiced by the claimant's failure to submit the claim.
>
> (2) Subsection (b)(1) and (2) of this section does not apply if, within 1 year after
> the injury to person or property that is the basis of the claim, the State has actual or
> constructive notice of:
>
> > (i) the claimant's injury; or
> >
> > (ii) the defect or circumstances giving rise to the claimant's injury.

State Gov't § 12-106(c).  Brooks contends the Court may hear his claims under either exception.

The Court disagrees.

### A.  Good cause

Brooks fails to satisfy the first exception under § 12-106(c)(1).  To avail himself of this

exception, he must raise it "on motion."  *Id.*  Brooks raises a good cause argument in his opposition,

not in a motion.  As a result, he cannot invoke the § 12-601(c)(1) exception.  *See Francis*, 2023

WL 2456553, at *26 (finding the plaintiff failed to demonstrate good cause where "[n]otably, [he]

has not filed a motion to excuse his failure, pursuant to [State Gov't] § 12-106(c)(1)" and his

allegations did not demonstrate good cause). But even construing his opposition argument as a motion, the Court finds Brooks has not demonstrated good cause.

Under the MTCA, "good cause" exists "if an ordinarily prudent person in the same circumstances would not have complied with the notice requirement." *Littleton v. Maryland*, No. JKB-17-3164, 2018 WL 1123694, at *5 (D. Md. Mar. 1, 2018) (citation omitted)). Though there is limited caselaw on the issue, courts have found good cause to excuse failure to satisfy the MTCA's notice requirement if an unrepresented plaintiff cannot comply due to the circumstances of his incarceration. *See Kelly v. Miller*, No. ELH-20-2531, 2022 WL 2703827, at *27 (D. Md. July 12, 2022) (finding good cause existed where the *pro se* plaintiff was incarcerated and on disciplinary segregation). *But see Francis*, 2023 WL 2456553, at *25 (finding no good cause existed where, despite the plaintiff being incarcerated and in solitary confinement during a portion of the notice period, he failed to submit notice after being released within one year of the incident).

Courts have considered what is "good cause" more frequently under an analogous provision in the Local Government Tort Claims Act ("LGTCA"), which also has a strict notice of claim requirement that must be met before local governments consent to waiver of governmental immunity. As with the MCTA, the LGTCA allows the court to excuse lack of notice "upon motion and for good cause shown." Md. Code Ann., Cts. & Jud. Proc. § 5-304; *Prince George's Cnty. v. Longtin*, 19 A.3d 859, 869 (Md. 2011) (noting that this provision "affords relief from strict application [of] the notice requirement"). Like the MTCA, the LGTCA's test for good cause is "whether the claimant prosecuted his claim with that degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances." *Heron v. Strader*, 761 A.2d 56, 63 (Md. 2000). This good cause exception "leaves the courts some discretion in enforcing the notice requirement, and allows a court, in certain circumstances, to avoid an unjust result."

*Longtin*, 19 A.3d at 869–70.  Though courts consider a combination of factors, the Maryland Supreme Court recognizes several broad categories of circumstances that constitute good cause, including "excusable neglect or mistake (generally determined in reference to a reasonably prudent person standard)."  *Heron*, 761 A.2d at 56 (citations omitted); *Moore v. Norouzi*, 807 A.2d 632, 647–49 (Md. 2002) (holding that the plaintiff demonstrated excusable neglect where a government contractor said it "received formal notification of" his injury and reasoning that "an ordinarily prudent person under the circumstances . . . reasonably could, and would, rely on [that] representation[]").  *But see Bibum v. Prince George's Cnty.*, 85 F. Supp. 2d 557, 565–66 (D. Md. 2000) (holding that the plaintiff failed to demonstrate good cause based on ignorance of the LGTCA's formal notice requirement); *Quigley v. United States*, 865 F. Supp. 2d 685, 693–94 (D. Md. 2012) (holding that the plaintiff failed to demonstrate excusable neglect because, among other reasons, she "does not explain why [her prior counsel] could not comply with the LGTCA" notice provision).

Brooks argues the Court should find good cause to excuse his failure to comply with the notice requirement because his attorney sent written notice of his claim just over five months after his arrest, even if actual receipt of the notice cannot be proven.  He also urges the Court to excuse the filing failure as "excusable neglect or mistake" because he did not become aware of any failure on the part of his lawyers until over two years later, when the State filed its motion to dismiss.  The Maryland Court of Appeals considered a similar argument in *Ransom v. Leopold*, 962 A.2d 1025 (Md. Ct. Spec. App. 2008).  There, the plaintiffs argued they diligently pursued their claims by obtaining and relying on counsel to prosecute their claims.  *Id.* at 1034–35.  Their counsel's law clerk mailed timely notice but to the wrong county.  *Id.* at 1035.  The court found that these circumstances did not constitute excusable neglect or mistake, rejecting counsel's argument that

10

the plaintiffs "should not be made to pay for the mistake of their lawyers." *Id*.  In doing so, it noted that counsel did not explain what accounted for the mistake. *Id.*

Brooks's circumstances are slightly different than those in *Ransom*, but as in *Ransom*, they do not amount to excusable neglect or mistake.  Brooks too relied on his counsel to file the notice of claim, but the error Brooks's counsel made was either not investigating when they did not receive the certified mail green card receipt even though the letter was sent "via certified mail/return receipt requested" or not retaining the green card to show the notice was received.  ECF 19-4, at 3.  Although the MTCA notice requirement does not require that notice be sent via certified mail with return receipt requested, under these facts in which Brooks's counsel did mail the notice with return receipt requested, that receipt (or some other evidence that the letter arrived) would dispute the State's evidence that it never arrived.  If counsel did not receive confirmation of the delivery, there was ample time—nearly seven months—before the expiration of the one-year notice period for the law firm to investigate why it did not receive a green card or to otherwise provide proper notice to the Treasurer.  *See* ECF 19-1, at 7.  As in *Ransom*, the affidavit from the counsel's administrative assistant does not explain why the failure to ensure that the Treasurer received the notice should constitute excusable neglect or mistake.  And, to the extent that Brooks suggests his attorney's errors should not be imputed to him, he misses the mark:  counsel acted as his agent when counsel or his agents attempted to comply with the notice requirement.  *See Fontell v. Hassett*, 870 F. Supp. 2d 395, 413 (D. Md. 2012) ("It is generally accepted . . . that the client-attorney relationship is one of principal and agent.  A principal is liable for the actions of an agent that are within the scope of the principal's apparent, as well as actual, authority." (citing *Am. Soc. of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982))).  Brooks has not demonstrated

good cause, due to excusable neglect or mistake or otherwise, to excuse his failure to provide notice of his claims.[4]

### B. Substantial Compliance

Nor does Brooks satisfy the second exception, under § 12-106(c)(2).  This exception, which excuses a failure to provide written notice when the State had actual or constructive notice of the claim, is generally referred to as the doctrine of substantial compliance.  *Francis*, 2023 WL 2456553, at *26.  Substantial compliance "entails a communication that provides the State requisite and timely notice of facts and circumstances giving rise to the claim."  *Id.* (quotation omitted).  But the doctrine is "narrowly construed."  *Id.* (quotation omitted).  And "[t]he doctrine of substantial compliance . . . is not license to ignore the clear mandate of the MTCA."  *Chinwuba v. Larsen*, 790 A.2d 83, 98 (Md. Ct. Spec. App. 2002), *rev'd on other grounds*, 832 A.2d 193 (Md. 2003).  Substantial compliance is not satisfied if a plaintiff fails to provide notice and "rel[ies] solely on the State's own efforts in acquiring information about the incident."  *Johnson v. Md. State Police*, 628 A.2d 162, 165 (Md. 1993).  In the analogous LGTCA context, Maryland courts have made clear that substantial compliance is only satisfied where a plaintiff "not only endeavors, or makes some effort, to provide the [required] information . . . to the [entity] responsible for investigating tort claims, but *actually does so*."  *Hansen v. City of Laurel*, 25 A.3d 122, 136 n.14 (Md. 2011) (emphasis added and internal quotation omitted) (dismissing complaint where the plaintiff failed to plead strict or substantial compliance with the LGTCA's notice requirement).

Brooks argues that the State had actual or constructive knowledge of his claims because in his view, the police report indicates that his arrest and charges were "clearly unwarranted and

---

[4] The letter indicates it also was sent via facsimile.  ECF 19-4, at 4.  Brooks has not offered a facsimile confirmation sheet showing the facsimile successfully transmitted.

unlawful," and the State's Attorney dismissed the charges shortly after Brooks was charged.  ECF

19-1, at 10.  This argument—that the police's and the State's Attorney's purported knowledge of

his civil rights claims gives the Treasurer notice of his claims—was squarely rejected by this court

in *Francis*:

> The notion that a State agency's awareness of an injury or occurrence satisfies the
> statutory notice requirement is misguided. The State, of course, functions through
> its agencies, departments, and their personnel.  But, there are numerous agencies
> with distinct tasks.  That the State's police and prosecutors have knowledge of a
> use of force incident does not impute notice to the State's Treasurer.  The police
> and prosecutors have interests and concerns that differ markedly from those of the
> Treasurer, who has fiscal concerns.

2023 WL 2456553, at *27.  The court then noted that the Treasurer "considers the fiscal

consequences of the claim, and then decides which of several options to pursue," providing the

State with an early opportunity to determine its course of action.  *Id.* (citing *Chinwuba*, 790 A.2d

at 99).  Here, even if the Court could infer from the decision to end the prosecution that the State

Attorney's office was aware of Brooks's tort claims—a leap the Court cannot make—this

awareness is not a substitute for notice to the Treasurer.[5]  Brooks has not demonstrated that the

proper State personnel had actual or constructive notice of his injury or the circumstances giving

rise to that injury under § 12-106(c)(2).  *See Ransom*, 962 A.2d at 1033 (holding plaintiff did not

substantially comply with the LGTCA's notice requirement where attorney sent letter sent to

wrong county); *Ellis v. Hous. Auth. of Balt. City*, 82 A.3d 161, 168–69 (Md. 2013) (noting "[a]

plaintiff does not substantially comply with the LGTCA notice requirement where the plaintiff

---

[5] Brooks cites two cases in support of his contention that actual or constructive notice to a county's
agent suffices, neither of which helps him.  In *Young v. Housing Authority of Baltimore City*, No.
SAG-21-996, 2021 WL 3852340, at *8 (D. Md. Aug. 27, 2021), and *Hine v. Prince George's
County*, No. TDC-20-2929, 2021 WL 5882615, at *4 (D. Md. Dec. 9, 2021), the court held that
the plaintiffs' filing of an EEOC charge that the defendant received constituted actual notice for
purposes of the LGTCA notice requirement.  Brooks's suit does not involve an EEOC charge.

does not 'in fact' give some kind of notice" and affirming dismissal based on holding that the plaintiffs failed to substantially comply with the LGTCA's notice requirement).

Brooks fails to satisfy either exception to the MTCA's notice requirement under § 12-106(c). "'In the absence of statutory authority to excuse the late filing' of a notice, claims under the MTCA against the State and its officials 'must fail.'" *Francis*, 2023 WL 2456553, at *24 (quoting *Simpson v. Moore*, 592 A.2d 1090, 1096 (Md. 1991)). The State's motion to dismiss the remaining claims against it (Counts 3, 4, and 5) is granted. The Court does not have subject matter jurisdiction over these claims.

### III.   The County and Sheriff Berry's motion to dismiss

The County and Sheriff Berry move under Rule 12(b)(6) to dismiss the claims against them for failure to state a claim upon which relief can be granted. To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777

(4th Cir. 2022).  But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments."  *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)).  Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard."  *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)).  The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."  *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

### A.  Claims against the County

In Counts 3, 4, and 5, Brooks asserts claims against the County under the Maryland Declaration of Rights Articles 24 and 26.  Count 3 is an excessive force claim under Article 24; Count 4 is an excessive force and deprivation of liberty claim under Article 26; and Count 5 is a *Longtin* unconstitutional policy or practice claim under Article 26.  While the Article 24 excessive force claim (Count 3) and the Article 26 excessive force and deprivation of liberty claim (Count 4) do not explicitly challenge an unconstitutional policy, practice, or training as the *Longtin* claim in Count 5 does, Brooks does allege in Counts 3 and 4 that the officers' actions "were in accordance with and/or because of the customs, practices, policy, training, and/or standards of conduct of . . . the County."  ECF 6, ¶¶ 75, 80.  Claim headings notwithstanding, the Court finds it prudent to construe the three state constitutional claims to include claims based on an unconstitutional policy, practice, or training.  In Count 10, Brooks asserts a § 1983 *Monell* claim for an unconstitutional practice, policy, custom and/or training.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). In *Longtin* claims, which are "essentially Maryland's version of *Monell* claims," a county may be

held liable for state constitutional deprivations stemming from its policies or practices.  *Palma v. Montgomery Cnty., Md.*, 598 F. Supp. 3d 288, n.5 (D. Md. 2022); *see Prince George's Cnty. v. Longtin*, 19 A.3d 859, 887 (Md. 2011).  *Monell* and *Longtin* claims "rise or fall together," and the Court may analyze them under the same standards.  *Id.*

### 1. *Respondeat superior*

In his state constitutional claims, Brooks alleges that during his arrest and detention, Officer McKimmie and other deputy sheriffs "were acting as agents of and within the scope of their employment by . . . the County" and acting "in accordance with and/or because of the customs, practices, policy, training, and/or standards of conduct of the Sheriff and the County."  ECF 6, ¶¶ 80, 84 (Count 3), ¶¶ 89, 92 (Count 4), ¶¶ 99, 100 (Count 5).  These claims advance a *respondeat superior* theory of liability in which Brooks seeks to hold the County liable for the actions of Sheriff Berry, Officer McKimmie, and the unnamed deputies.  Maryland law, unlike federal law, recognizes that local governmental entities have "*respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment."  *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 194 n.6 (4th Cir. 2002) (quoting *DiPino v. Davis*, 729 A.2d 354, 372 (Md. 1999)).

But under Maryland law, Sheriff Berry, Officer McKimmie, and the other sheriff deputies are State, not County, employees.  "Under Maryland's Constitution, county sheriffs are independently elected constitutional officers."  *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 726 (D. Md. 2013) (citing Md. Const., art. 4, § 44).  As such, it is "well settled [under Maryland law] that, as a general rule, county sheriffs and their deputies are 'officials and/or employees of the State of Maryland,' rather than their county."  *Id.* (quoting *Rucker v. Harford Cnty.*, 558 A.2d 399, 402 (Md. 1989)); *Boyer v. State*, 594 A.2d 121, 128 (Md. 1991) (declining to impose

*respondeat superior* liability on county for actions of deputy sheriffs).  The State, not the County, "is answerable for their actions."  *Ledergerber v. Blubaugh*, No. JKB-20-1208, 2020 WL 7029868, at *4 (D. Md. Nov. 30, 2020) (citing *Rucker* and dismissing claims seeking to hold county liable for officers' actions).

In response, Brooks contends that the Court cannot decide, as a matter of law, that the Sheriff and deputy sheriffs acted as employees of the State.  He points to *Rucker*, in which the court acknowledged that its holding that county sheriffs and their deputies are state, not county, employees for civil liability purposes "does not mean that, for some purposes and in some contexts, a sheriff may not be treated as a local government employee," including in matters related to local funding or employee benefits.  558 A.2d. at 406 (noting "a sheriff may be included under a county-established pension plan"); *see Paulone*, 787 F. Supp. 2d at 375 (quoting *Rucker*).  And, in at least one instance, a sheriff's actions have given rise to county liability.  In *Santos v. Frederick County Board of Commissioners*, the plaintiff brought a § 1983 claim against Frederick County after an officer detained her on an outstanding federal Immigration and Customs Enforcement warrant, and the court granted summary judgment to the plaintiff on the claim based on "the Sheriff's actions in his official capacity and as a final policy maker for Frederick County."  346 F. Supp. 3d 785, 790, 795, 798, 802 (D. Md. 2018).  The *Santos* Court observed that its conclusion was an outlier:

> This case turns on the unusual fact that the 8 U.S.C. [§] 1357(g) program and the agreement reached between ICE and Sheriff Jenkins is not an exercise of state executive power—it is, instead, a unique agreement whereby the federal government directly delegates its own plenary power over immigration by deputizing local political subdivisions to "perform certain functions of an immigration officer."  Accordingly, irrespective of Maryland case law or the common finding that a sheriff in Maryland conducting law enforcement duties is a state actor, this case requires the fine-grained context-specific analysis of policymaking authority mandated by *McMillian* and its forebears.

*Id.* at 794 (citation to record omitted).  But for law enforcement matters in general—like the tort claims arising from the police car chase in *Rucker*—sheriffs are considered state employees.  *See*

*Rucker*, 558 A.2d at 402; *Ledergerber*, 2020 WL 7029868, at *4; *Paulone*, 787 F. Supp. 2d at 375 (noting that "[f]or purposes of civil liability, Maryland courts ordinarily treat sheriffs as state officials" and collecting cases).  Though Brooks attempts to raise a factual dispute over whether Sheriff Berry and his deputies were acting as state or county employees, his allegations concern only their performance of their duties as law enforcement officers.  There are no allegations from which the Court could possibly differentiate cases like *Rucker* and *Ledergerber* and infer that the sheriff and his deputies acted as county employees.  Brooks's allegations that Sheriff Berry, Officer McKimmie, and the other sheriff deputies violated his constitutional rights when they arrested him are quintessential law enforcement conduct.  Under these allegations, they are state employees.

Brooks's cited authority is unpersuasive.  He relies on *Murphy-Taylor v. Hofmann* for his contention that it is inappropriate to rule as a matter of law that a sheriff's deputy is a state employee.  968 F. Supp. 2d 693 (D. Md. 2013).  In *Murphy-Taylor*, the plaintiff, a deputy sheriff, brought sexual harassment and assault claims against the sheriff, state, and county, asserting that each was her "employer."  *Id.* at 725.  The determination of which defendant was the plaintiff's employer turned on a joint employer analysis of the county's control over sheriff department employees with regard to engagement in employment practices like hiring, firing, discipline, benefits, and leave—not performing law enforcement functions.  *Id.* at 726.  The court contrasted Murphy-Taylor's suit with cases that assess "whether a county would be liable for alleged civil rights violations committed against private citizens by deputy sheriffs acting in a law enforcement or correctional capacity, rather than liability to an employee of a sheriff's office concerning conditions of employment."  *Id.* at 726–27.  This case falls within that category of cases.

Brooks also cites *Dorsey v. Sokoloff*, a case in which this court declined to decide on summary judgment whether the deputy sheriff was acting as a state or county employee when he repeatedly deployed his Taser on an unarmed individual.  381 F. Supp. 3d 521, 535 (D. Md. 2019), *aff'd on other grounds*, No. 19-1671, 2021 WL 5275535 (4th Cir. Nov. 12, 2021).  There, the court questioned whether the deputy was performing law enforcement operations, which it stated was a fact-intensive inquiry under the circumstances.  Here, Brooks does not argue the deputies were not performing law enforcement operations when they arrested him, and they plainly were.

Brooks next argues that under § 9-108 of the State Finance and Procurement Article, the sheriff deputies are county employees.  This provision renders counties (not the State) financially responsible for coverage and defense costs stemming from law-enforcement related activities of sheriffs and deputy sheriffs.  *See* Md. Code Ann., State Fin. & Proc. § 9-108.  Brooks argues because the counties are financially responsible for "the coverage and defense necessary under the Maryland Tort Claims Act" for sheriffs and deputy sheriffs "performing law enforcement functions or detention center functions," *id.*, the sheriff and his deputies are county employees. This court rejected an identical argument in *Ledergerber*, 2020 WL 7029868, at *5.  The court reasoned that a determination that sheriffs or deputy sheriffs are state employees for *liability* purposes "does not in any way affect [the county's] obligations in relation to defense and coverage under Md. Code Ann. State Fin & Proc. § 9-108," and "the existence of such obligations does not render [the county] subject to direct liability . . . ."  *Id.* (citing *Barbre v. Pope*, 935 A.2d 699, 713 n.18 (Md. 2007) (noting state statutes that provide for the Maryland Board of Public Works to pay "certain tort judgments based on the negligence of a sheriff or deputy sheriffs acting in the scope of employment . . . out of moneys due the county involved . . . . do not authorize tort actions against

counties based on the negligence of State personnel acting within the scope of employment" (quoting *Boyer v. State*, 594 A.2d 121, 128 n.10 (Md. 1991)))).

Brooks's state constitutional claims against the County under a *respondeat superior* theory fail as a matter of law because Sheriff Berry and his deputies are employees of the State.

### 2.   Unconstitutional policy, practice, or custom, or training

Brooks's tenth count asserts an unconstitutional practice, policy, custom and/or training claim against the County under § 1983.[6]   Similarly, Brooks alleges in his Article 24 excessive force claim (Count 3) that the officers' actions "were in accordance with and/or because of the customs, practices, policy, training, and/or standards of conduct of the . . . County."  ECF 6, ¶ 80. He repeats this allegation in his Article 26 excessive force and deprivation of liberty claim (Count 4) and unconstitutional policy or practice claim (Count 5).  *Id.* ¶¶ 89, 100.  In Count 5, he elaborates that the County violated his constitutional rights by "authorizing, permitting, and/or allowing" the officers' actions, including "the use of force to wrongfully arrest and detain Mr. Brooks without a warrant . . . and without any prior notice of trespassing as required by law."  *Id.* ¶ 96.  These actions were "in accordance with the unconstitutional practice, custom, policy and/or training" of the County.  *Id.* ¶ 100.  Brooks seeks injunctive relief enjoining the County from "training, authorizing, permitting, or allowing" the "use of force against handcuffed arrestees without legitimate policy necessity" and the "use of force and deprivation of liberty without legal justification and a warrant

---

[6] Though he labels Count 10 an "unconstitutional practice, policy, custom and/or training" claim, Brooks also alleges in this claim that Officer McKimmie and the other deputies "were acting as agents of and within the scope of their employment by" the County.  ECF 6, ¶ 150.  To the extent that Brooks attempts to advance a *respondeat superior* theory of liability against the County in his § 1983 claim, he cannot do so.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) ("[T]here is no respondeat superior liability under § 1983." (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"))).

as required by law." *Id.* ¶ 101.  He also asks the Court to compel the County to adopt a general order "preventing their officers from acting upon a false report by arresting and detaining a person without legal justification or warrant." *Id.*   The Court considers these state and federal constitutional claims together under the framework for a § 1983 *Monell* claim.

Section 1983 imposes liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights[.]"  42 U.S.C. § 1983.  Under *Monell v. Department of Social Services*, a municipality can be liable under § 1983 "if the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  436 U.S. 658, 690 (1978).  To state a *Monell* claim, Brooks must plausibly allege "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of [his constitutional] rights."  *Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (quoting *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994)); *see Palma v. Montgomery Cnty., Md.*, 598 F. Supp. 3d 288, 296 (D. Md. 2022).  This policy or practice may be established through "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Palma*, 598 F. Supp. 3d at 296 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)); *see also Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).  This means a plaintiff may base a *Monell* claim on "written ordinances and regulations" or "certain affirmative decisions of individual policymaking officials" or, "outside of such formal decisionmaking channels," on "a practice [that] is so 'persistent and widespread' and 'so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell*, 436 U.S. at 691).

"[O]ne or two isolated constitutional violations alone cannot constitute a policy or custom of unconstitutional conduct." *Palma*, 598 F. Supp. 3d at 297; *Drewry v. Stevenson*, No. WDQ-09-2340, 2010 WL 93268, at *3 (D. Md. Jan. 6, 2010) ("[I]solated incidents are insufficient to create local government liability." (citing *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000))).   For instance, in *Carter*, the Fourth Circuit affirmed summary judgment in favor of the City of Danville, Virginia on a § 1983 claims where the plaintiff alleged "prior instances of excessive force and the discouragement of citizen complaints," but the bulk of those allegations and the evidence she proffered in support were not relevant to her specific circumstances because they were not "particularized violations that [we]re similar in kind to her own."  164 F.3d at 219.  Setting aside those unrelated allegations, the plaintiff identified only two other instances of arguably unlawful arrests or unreasonable searches and seizures, neither of which demonstrated that the city condoned improper behavior by its officers.  *Id.* at 220.  Crucially, this "meager history of isolated incidents" did not approach the "widespread and permanent practice necessary to establish municipal custom."  *Id.* at 220 (internal quotation omitted).  The court concluded that the plaintiff failed to plausibly "establish the unconstitutional policy or custom with the appropriate precision." *Id.* at 216.

Brooks's complaint fares no better than Carter's.  Brooks alleges that the County (and the Sheriff and the State of Maryland) have an "unconstitutional policy [or] practice . . . authorizing the use of force on or near airways of restrained suspects" and an unconstitutional policy or practice that "authoriz[ed], permit[ed], and/or allow[ed] the use of force to wrongfully arrest and detain Brooks without a warrant for disturbing the peace and trespassing, and without any prior notice of trespassing as required by law" and that the officers' actions "arose from" and "were in accordance with" those policies.  ECF 6, ¶¶ 146–47, 151.  He does not identify a relevant ordinance or

regulation.  Insofar as he alleges a less formal policy or decision by a policymaking official, his allegations are purely speculative.  He also does not sufficiently allege a persistent and widespread practice.  Brooks does not allege any other incidents similar to his encounter with the police in October 2019.  His allegation of one "isolated constitutional violation alone[] cannot constitute a policy or custom of unconstitutional conduct."  *Palma*, 598 F. Supp. 3d at 297.  Brooks fails to sufficiently allege that the alleged practices involving use of excessive force and warrantless arrests and detainments constitute an unconstitutional policy or custom.

Even if Brooks had adequately alleged a formal or informal policy of unconstitutional conduct, he has not alleged the County was the decisionmaker for the policy.  Whatever approach a plaintiff takes in alleging an unconstitutional policy, a municipality only may be held liable for the policy if the "decisionmaker" who established the policy "possesse[d] final authority" to do so.  *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 554–55 (4th Cir. 2018) (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016) (internal quotation marks omitted)); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  Thus, for example,

> [T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. . . .  Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. *However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.*

*Hunter*, 897 F.3d at 555 (quoting *Pembaur*, 475 U.S. at 483 n.12).

Brooks does not allege that the unnamed policy was established by someone with the authority to establish policy on behalf of the County.  Rather, he repeatedly alleges that "[t]he actions of Officer McKimmie and the Charles County Sheriff's Office deputies were in accordance

with and/or because of the customs, practices, policy, training, and/or standards of conduct of the Sheriff of Charles County," without alleging that the sheriff—a state employee—had the authority to establish a policy on behalf of the County.  ECF 6, ¶¶ 66, 75, 80, 89; *see also id.* ¶¶ 108, 120, 131.  Brooks also alleges more broadly that "[t]he actions of Officer McKimmie and the Charles County Sheriff's Office deputies were in accordance with the unconstitutional practice, custom, policy and/or training they received from the Sheriff *and* the County."  *Id.* ¶ 100 (emphasis added). Additionally, he alleges that "the Sheriff, the County and the State of Maryland" had unconstitutional policies or practices and/or provided unconstitutional training that authorized "the use of force on or near airways of restrained suspects" and warrantless arrests and detentions, and the officers' actions "were in accordance with" these policies, practices, and/or training.  *Id.* ¶¶ 146–47, 151.  None of these vague allegations identifies the decisionmaker behind the policy from which the Court could plausibly infer that the County is liable for the decisionmaker's actions.

Nor has Brooks sufficiently alleged an inadequate training claim under § 1983.  "In the context of a police department, the institutional failure to train its officers 'about their legal duty to avoid violating citizens' rights' or to correct persistent and widespread unconstitutional practices can form the basis of a *Monell* claim."  *Palma*, 598 F. Supp. 3d at 298 (quoting *Connick*, 563 U.S. at 61).  To state a § 1983 claim for inadequate training, "the failure to train [must] amount to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989).  A plaintiff asserting a failure to train theory must plausibly allege that "(1) the nature of the training was insufficient in some particularized manner; (2) the insufficiency of the training was a deliberate or conscious choice; and (3) a causal relationship existed between the failure-to-train and the injuries suffered."  *Palma*,

598 F. Supp. 3d at 298 (citation omitted); *see also Drewry*, 2010 WL 93268, at *4 (at the pleadings stage, a plaintiff cannot rely on legal conclusion and speculation but must allege at least some facts supporting the elements of the claim).  A plaintiff must identify "a specific deficiency in training, rather than general laxness or ineffectiveness in training." *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020) (internal quotations omitted).  And "a single incident of misconduct by a police officer is not sufficient to state a claim for inadequate training." *Drewry*, 2010 WL 93268, at *4 (citing *Doe*, 225 F.3d at 456).

Brooks alleges generally that "the Sheriff, the County and the State of Maryland" provided unconstitutional training that authorized "the use of force on or near airways of restrained suspects" and that the County deputies are "trained . . . to use force and/or to arrest and detain a person, despite lacking a warrant or providing proper notice as required by law." *Id.* ¶¶ 147–48.  Yet the complaint is wholly devoid of any factual detail about the nature of the training that the County provides or allegations suggesting that the training deficiencies were a deliberate or conscious choice by the County.  Again, the pleading problems are twofold:  Brooks neither sufficiently alleges a failure to train nor alleges that it was the County—as opposed to the State—that was responsible for training. *See Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 726 (D. Md. 2013).  His scant allegations fail to plausibly allege a *Monell* claim under a failure to train theory.

Brooks's § 1983 claim and state constitutional claims against the County are dismissed.

## B.  Claims against Sheriff Berry

### 1.  Section 1983 claim (Count 10)

Brooks asserts a § 1983 claim against Sheriff Berry in his official capacity.  As discussed, Brooks has not alleged any unusual facts under which Sheriff Berry, a state employee, would be deemed a county official.  *See Ledergerber*, 2020 WL 7029868, at *4 (noting "only in unusual

circumstances, such as when a sheriff acts as a local policy maker, can a county be subject to liability for his actions under *Monell*"); *Rossignol v. Voorhaar*, 321 F. Supp. 2d 642, 650–51 (D. Md. 2004) (holding that a sheriff is a state official when acting in a law enforcement capacity). Therefore, this claim against Sherriff Berry in his official capacity is against the State. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). But the State is not a "person" within the meaning of § 1983. *Id.*; *Williams v. Prince George's Cnty., Md.*, 157 F. Supp. 2d 596, 604 (D. Md. 2001) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). To the extent that Brooks seeks damages against Sheriff Berry in his official capacity, the Eleventh Amendment bars this suit. *Graham*, 473 U.S. at 169 ("[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court. This bar remains in effect when State officials are sued for damages in their official capacity." (citations and footnote omitted)); *Rossignol*, 321 F. Supp. 2d at 651 (dismissing § 1983 claim for damages against county sheriff in his official capacity as barred by the Eleventh Amendment).

Brooks also seeks prospective injunctive relief against Sheriff Berry under § 1983. Under the *Ex Parte Young* exception to Eleventh Amendment immunity, a plaintiff may seek prospective injunctive relief against a state official for an ongoing violation of federal law. *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 204 (4th Cir. 2001) (citing *Ex Parte Young*, 209 U.S. 123 (1908)); *see Will*, 491 U.S. at 71 n.10 ("[O]fficial-capacity actions for prospective relief are not treated as actions against the State." (quoting *Graham*, 473 U.S. at 167 n.14). To proceed under the *Ex Parte Young* exception, Brooks must challenge a ministerial, not discretionary, act by Sheriff Berry as a state official. *See Antrican v. Odom*, 290 F.3d 178, 191 (4th Cir. 2002) (citing *Ex Parte Young*, 209 U.S. at 158 ("There is no doubt that the court cannot control the exercise of the discretion of an officer. It can only direct affirmative action where the officer having some duty to perform not

involving discretion, but merely ministerial in its nature, refuses or neglects to take such action.")).

A ministerial act is "a plain official duty, requiring no exercise of discretion . . . ." *Bd. of Liquidation v. McComb*, 92 U.S. 531, 541 (1875).

In his § 1983 claim against Sheriff Berry, Brooks seeks injunctive relief to enjoin Sheriff Berry from "training, authorizing, permitting, or allowing" either "the use of force against handcuffed arrestees without legitimate policy necessity" or "the use of force and deprivation of liberty without legal justification and a warrant as required by law."  ECF 6, ¶ 152.  He also seeks to compel Sheriff Berry to "adopt a general order preventing their officers from acting upon a false report by arresting and detaining a person without legal justification or warrant as required by law." *Id.*  These acts—training, permitting, or allowing officers to use excessive force and to arrest without a warrant or legal justification—plainly involve the exercise of discretion.  *See Calhoun-El v. Bishop*, No. RDB-13-3868, 2016 WL 5453033, at *4 (D. Md. Sept. 29, 2016) (noting an act is discretionary if it "involves an exercise of [an official's] personal judgment" and "also includes, to more than a minor degree, the manner in which the police power of the State should be utilized" (quoting *Baltimore Police Dep't v. Cherkes*, 780 A.2d 410, 437 (Md. Ct. App. 2001))); *Madison v. Harford Cnty.*, No. MJG-10-197, 2011 WL 13362482, at *3 (D. Md. May 3, 2011) (stating "alleged[] fail[ure] to properly train and supervise the [sheriff's office deputies]" is a "discretionary [act] where the [officials] had freedom to act according to their judgment").  In *Calhoun-El*, this court concluded that "alleged negligence in developing rules, guidelines, procedures, and protocols that would sufficiently train correctional officers and prevent the type of injury suffered by plaintiff were discretionary acts." *Id.* at *5.  They are not ministerial acts that follow protocol.  Brooks's request for injunctive relief does not fall within the *Ex Parte Young* exception to Eleventh Amendment immunity.

Brooks's § 1983 claim against Sheriff Berry is dismissed.

### 2.  State constitutional claims

Brooks asserts various state constitutional claims against Sheriff Berry, whom the Court has determined is a state employee.  State personnel like Sheriff Berry may be sued in tort for acts within the scope of their duties pursuant to the MTCA's limited waiver of sovereign immunity. *Paulone*, 718 F. Supp. 2d at 637; *Barbre*, 935 A.2d at 709.  The limited waiver of immunity under the MTCA was not triggered here because Brooks failed to comply with the MTCA's notice requirement.

Still, this immunity is waived "if the tortious act or omission by state personnel is outside the scope of their public duties or made with malice or gross negligence." *Francis*, 2023 WL 2456553, at *28 (citing Md. Code Ann., Cts. & Jud. Proc. § 5–522(a)).  "[C]ompliance with the MTCA's notice requirement is not necessary in a suit against individual State personnel in which it is sufficiently alleged that the defendants acted with malice or gross negligence." *Id.* (citing *Barbre*, 935 A.2d at 714).

In the context of MTCA immunity, "malice" refers to "actual malice," meaning "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Lee v. Cline*, 863 A.2d 297, 311 (Md. 2004) (internal quotations omitted).  To demonstrate malice, a plaintiff must "show that the government official 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Nero v. Mosby*, 890 F.3d 106, 127 (4th Cir. 2018) (quoting *Bord v. Baltimore Cnty.*, 104 A.3d 948, 964 (Md. 2014)).  Gross negligence in the MTCA context is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a

thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Newell v. Runnels*, 967 A.2d 729, 764 (Md. 2009) (citation omitted).  A plaintiff must allege "specific facts that raise an inference that [the official's] actions were improperly motivated." *Nero*, 890 F.3d at 128; *see Boyer v. State*, 594 A.2d 121, 132 (Md. 1991).

In Counts 3, 4, and 5, Brooks alleges that the actions of Officer McKimmie and the other deputy sheriffs were made in accordance with the "customs, practices, policy, training, and/or standards of conduct of the Sheriff." ECF 6, ¶¶ 80, 89, 100.  He further alleges that those officers— who were actually involved in the incident—acted with ill will, actual malice, and/or gross negligence. *Id.* 82, 91.  But Brooks offers no allegations whatsoever that Sheriff Berry, who was not on the scene, took any action, let alone that he did so "intentionally . . . with an evil or rancorous motive."  Nor has he pled specific facts that Sheriff Berry failed to perform any duty, let alone that doing so was an "intentional failure . . . in reckless disregard" of others.  Even accepting his allegations as true and drawing all inferences in his favor, Brooks fails to plausibly allege that Sheriff Berry acted with malice or gross negligence.  *See Francis*, 2023 WL 2456553, at *32–33 (dismissing claims against state officials where the plaintiff pled only generic allegations that they acted with malice or gross negligence and did not plead facts indicating that they had personal involvement in the implementation of challenged policies).

Counts 3, 4, and 5 against Sheriff Berry are dismissed.

**IV.   Conclusion**

      For the foregoing reasons, the motions to dismiss, ECF 12 & 13, are granted.  A separate

order follows.


_September 26, 2023_
Date

                                  Deborah L. Boardman
                                  United States District Judge