## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**PHILLIP JOSHUA KYLE BROOKS,**            *

      **Plaintiff,**            *

**v.**            *            **Civ. No. DLB-23-0208**

**TIMOTHY MCKIMMIE,**            *

      **Defendant.**            *

## MEMORANDUM OPINION

Phillip Joshua Kyle Brooks filed suit against the State of Maryland ("the State"), Charles County, Maryland ("the County"), St. Charles Hotel Operating, LLC d/b/a Hilton Garden Inn ("Hilton"), Officer Timothy McKimmie, and Sheriff Troy Berry alleging various constitutional and tort claims related to Brooks's October 2019 arrest at the Hilton in Waldorf, Maryland. Pending before the Court is McKimmie's motion for summary judgment. For the following reasons, the motion for summary judgment is denied.

### I.    Factual and Procedural Background

### A.  Facts

Brooks, a California resident, visited Maryland in October 2019 for a business conference. ECF 52-2, at 58:9–59:4. Brooks was also in town to attend his younger brother's funeral. *Id.* at 58:19–59:4. Brooks checked in to the Hilton in Waldorf on October 9. ECF 52-3, at 46:3–15. Brooks arrived late at night. ECF 52-2, at 61:10–16. When he arrived, he saw the hotel manager, Leonard Lowery, at the desk. *Id.* at 63:11–20. Because the door to the hotel would not open, Brooks knocked on the door and tried to get Lowery's attention to let him into the hotel. *Id.* at 63:11–64:21. Lowery seemed to "go[] out of his way to not notice [Brooks]." *Id.* at 63:13–15. After about ten or fifteen minutes of waiting, one of Brooks's colleagues banged on the glass and Lowery

opened the door. *Id.* at 64:22–65:14, 68:8–13. Lowery apologized for the delay and checked Brooks into a room. *Id.* at 69:19–21, 71:21–72:16. To Brooks's disappointment, the room was unclean. *Id.* at 72:14–22. Brooks went back to the hotel lobby and expressed his frustrations with his unclean room to Lowery. *Id.* at 76:18–77:3. Lowery checked Brooks into a different room. *Id.* at 77:20–80:5. Brooks went to his new room and stayed there for the rest of the night. *Id.* at 85:14–17.

Brooks attended the conference the next day. *Id.* at 88:18–21. After the meetings, Brooks went out to dinner with his colleagues and consumed a couple of drinks. *Id.* at 89:7–92:3. Brooks returned to the hotel, and he and a few of his colleagues started drinking in the hotel's lobby. *Id.* at 95:12–21. Lowery asked the group to leave, as the hotel's bar was closed. *Id.* at 96:11–13. Brooks asked Lowery why they needed to leave, considering Lowery had permitted people to drink in the lobby the previous evening. *Id.* at 102:20–103:13. One of Brooks's colleagues told Brooks that he noticed Lowery's animosity towards him but suggested Brooks ignore it. *Id.* at 103:9–12. The group then left the lobby and continued to drink in Brooks's room. *Id.* at 106:1–107:9. After a few hours of socializing, the rest of the group left Brooks's room. *Id.*

At around 2:30 a.m., Brooks returned to the lobby and greeted some colleagues. *Id.* at 174:15–176:10. While in the lobby, Brooks and Lowery began speaking. *Id.* at 180:10–16. Brooks asked Lowery why he had acted rudely towards him. *Id.* at 113:12–21. Lowery dismissed his concerns. *Id.* at 117:13–19. The conversation became heated. *Id.* at 117:20–118:8. Brooks made a joke about Lowery's height. *Id.* at 119:12–20. At one point, Brooks leaned in and pointed his finger at Lowery. *Id.* at 121:3–5. Brooks also swatted several items off Lowery's desk, including what Lowery believed was a large, ten- to fifteen-pound paperweight, ECF 52-3, at 70:2–13, 95:12–15, and what Brooks believed was an empty suggestion box, ECF 52-2, at 191:3–6. Lowery then

picked up the phone to call the police, and Brooks left the hotel. ECF 52-3, at 68:14–15; ECF 52-2, at 191:22–192:10.

As Brooks left the hotel, Lowery dialed 911 and spoke with a police dispatcher. ECF 52-3 at 68:14–15. Lowery asked for police officers to come to the hotel to calm down Brooks. *Id.* at 69:8–18. Two police officers, Corporal Timothy McKimmie and Deputy Ryan, responded within the next few minutes. *Id.* at 71:11–16; ECF 52-4, at 19:20–20:1. Lowery told the officers that he wanted them to calm down Brooks and gave them a description of Brooks's physical appearance. ECF 52-3, at 71:17–21. He told the officers that Brooks had left the hotel. *Id.* at 72:1–3. The officers told Lowery to call them when Brooks returned. *Id.* at 72:3–4.

Brooks returned to the hotel ten minutes later. *Id.* at 76:11–12. Brooks walked straight to his room and did not speak to Lowery. ECF 52-2, at 194:16–20. Lowery called 911 again. ECF 52-3, at 74:17–18. The parties dispute the contents of that call. The dispatch report states that Lowery said that Brooks was "back at the front desk intoxicated and yelling at [Lowery], threatening to become violent." ECF 58-5, at 2. It also says that Brooks was "threatening to throw things at [Lowery] now." *Id.* Lowery testified that he did not say that; rather, he simply told the dispatcher that Brooks had returned to the hotel. ECF 52-3, at 80:12–18.

McKimmie and Ryan arrived at the hotel a few minutes later and proceeded to Brooks's room. ECF 52-4, at 37:16–38:1. One of the officers knocked on Brooks's door. *Id.* at 41:15–42:3. Brooks looked through the peephole and saw the officers. ECF 52-2, at 138:14–20. From behind the door, Brooks asked the officers why they were there and what he needed to do. *Id.* at 138:20–139:1. McKimmie told Brooks that Lowery would like Brooks to stay in his room and to stop coming out and causing a disturbance. ECF 52-4, at 42:19–43:3. McKimmie testified that Brooks said that he would "do what [he] wants" and swore repeatedly at them, *id.* at 42:14–44:7, which

Brooks denies, ECF 52-2, at 149:12–16. McKimmie also testified that he overhead Brooks say to someone on the phone that there were "two fat, white cops here," ECF 52-4, at 43:15–16, which Brooks does not recall saying, ECF 52-2, at 142:6–143:3.

The officers then returned to Lowery. ECF 52-4, at 48:8–13. McKimmie told Lowery that they could not "get through to [Brooks]," and that Brooks was "just yelling stuff" at them. *Id.* at 36:2–4. Lowery told the officers that he wanted Brooks evicted from the hotel. *Id.* at 36:4–18. Lowery gave the officers a key card to enter Brooks's room. *Id.* at 48:17–22. The officers radioed for additional support, and another officer, Officer Keyes, responded to the scene. *Id.* at 51:22–52:7.

The officers went to Brooks's room a second time and knocked on his door. *Id.* at 52:14–22. McKimmie told Brooks that Lowery now wanted him to leave the hotel. *Id.* at 52:20–21. Brooks was confused and told McKimmie that Lowery had not asked him to leave the hotel or given him a refund. ECF 56-1, at 7. McKimmie told Brooks: "[T]he hotel manager wants you to leave. You're not willing to leave. You've been told to leave, you're trespassing. If you don't come out and leave on your own accord, then I'm going to have to lock you up for trespassing." ECF 52-4, at 54:13–18; *see* ECF 52-2, at 143:4–9 (statement of Brooks that he remembered the officers saying "if you do not open this door, you will be arrested for trespassing"), 347:17–21 (statement of Brooks that he heard the officers say "open the door or we will arrest you for trespassing"), 136:12–14 (statement of Brooks stating "I remember specifically them saying if I did not open the door, I would be arrested for trespassing"); ECF 56-1, at 7 (Brooks's interrogatory that "[o]ne of the officers told [him] that if he did not open the door, he would be arrested for trespassing").

McKimmie testified that he and the other officers "tried a couple more times," but "Brooks was still not willing to have a conversation with us." ECF 52-4, at 60:12–16. So the officers

decided to "go in the room and try to talk to him." *Id.* at 60:15–16. McKimmie then tried to open the door with the key card, but Brooks was holding his foot against the door to prevent it from opening. *Id.* at 61:4–7.

Brooks, on the other hand, testified that he complied with McKimmie's demand to open the door. ECF 52-2, at 143:14–15. Brooks asked the officers to "give [him] a second" so he could unlatch the door. *Id.* at 144:6–17. Before Brooks could open the door, the officers forced it open. *Id.* at 150:22–153:21. The door hit Brooks in the head and made him fall back. *Id.* at 155:15–16. Keyes and Ryan rushed at Brooks, who fell to the floor facedown. *Id.* at 155:16–18. Later on, Ryan told McKimmie that he saw Brooks "t[ake] an aggressive stance towards [him]." ECF 52-4, at 71:6–12. McKimmie handcuffed Brooks behind his back as Keyes and Ryan pinned him to the floor. *Id.* at 76:1–6; ECF 52-2, at 156:3–7. Brooks testified that he did not resist arrest. ECF 52-2, at 150:14–16. One of the officers smushed his face into the floor while he was being handcuffed. *Id.* at 156:3–7, 158:3–4. Brooks testified that it was "most likely" McKimmie who pushed his face into the floor, *id.* at 158:7–9, but that he could not see who it was because he was lying face down and afraid to look up, *id.* at 156:8–157:9. McKimmie does not mention using this force. Instead, he testified that he "climbed up on the bed and then leaned over and applied handcuffs." ECF 52-4, at 76:2–6. The officers took Brooks to a police cruiser parked outside. ECF 52-2, at 161:16–20. Brooks screamed for help as the officers moved him outside. *Id.* at 161:21–162:6.

McKimmie transported Brooks to the Charles County Detention Center, where Brooks was detained overnight. ECF 52-4, at 85:14–18. McKimmie prepared a statement of charges, formally charging Brooks with disturbing the peace, in violation of Maryland Code, Criminal Law § 10-201(c)(5), and trespassing, in violation of Maryland Code, Criminal Law § 6-403. *See* ECF 56-5, at 2. He also prepared a statement of probable cause. *See* ECF 56-6. The next day, officers escorted

Brooks back to the Hilton to retrieve his belongings. ECF 52-2, at 168:5–8. On December 6, 2019, the criminal charges against Brooks were dismissed *nolle prosequi*. *See* ECF 56-1, at 8.

### B. Procedural History

On October 3, 2022, Brooks filed suit in state court against Hilton, McKimmie, Sherriff Berry, Charles County, and the State of Maryland. ECF 1, ¶ 1. Brooks amended his complaint to add federal claims. *Id.* ¶¶ 5, 6. The defendants removed the complaint to federal court. *Id.* ¶ 13.

In his amended complaint, Brooks asserted ten causes of action. ECF 6, ¶¶ 55–152. In Count One, he alleged that Hilton and McKimmie violated his right to be free from false arrest. *Id.* ¶¶ 55–67. In Count Two, he alleged that McKimmie violated his right to be free from false imprisonment. *Id.* ¶¶ 68–76. In Counts Three and Four, he alleged that McKimmie, Berry, Charles County, and the State violated his rights to be free from excessive force and unlawful seizure under Articles 24 and 26 of the Maryland Declaration of Rights. *Id.* ¶¶ 77–93. In Count Five, he alleged that Berry, Charles County, and the State violated Article 26 of the Maryland Declaration of Rights by acting in accordance with an unconstitutional practice, custom, policy, or training. *Id.* ¶¶ 94–101. In Count Six, he alleged that McKimmie committed battery. *Id.* ¶¶ 102–09. In Count Seven, he alleged that Hilton and McKimmie intentionally inflicted emotional distress. *Id.* ¶¶ 110–24. In Count Eight, he alleged that McKimmie caused his malicious prosecution. *Id.* ¶¶ 125–33. In Count Nine, he alleged that McKimmie, in his individual capacity, violated his rights to be free from unreasonable seizures and excessive force in violation of 42 U.S.C. § 1983. *Id.* ¶¶ 134–42. And in Count Ten, he alleged that McKimmie, in his official capacity, Berry, Charles County, and the State violated his right to be free from excessive force in violation of 42 U.S.C. § 1983. *Id.* ¶¶ 143–52.

Berry, Charles County, and the State moved to dismiss the claims against them. ECF 12, 13. The Court granted those motions and dismissed all claims against those defendants. *Brooks v.*

*St. Charles Hotel Operating*, Civ. No. DLB-23-0208, 2023 WL 6244612, at \*14 (D. Md. Sept. 26, 2023). Brooks then voluntarily dismissed his intentional infliction of emotional distress claim against Hilton and McKimmie. ECF 25. The remaining defendants were McKimmie and Hilton, and the remaining claims were false imprisonment, malicious prosecution, battery, false arrest, and the federal and state constitutional claims for false arrest and excessive use of force.

After the close of discovery, McKimmie and Hilton moved for summary judgment on the claims against them. ECF 52 & 53. The motions were fully briefed. ECF 52-1, 56, 57 (McKimmie); ECF 53-1, 58, 59 (Hilton). At a January 16, 2025 motions hearing, the Court granted summary judgment in favor of Hilton and took McKimmie's motion under advisement. ECF 62.

## II.    Standard of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the movant must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted). However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from

proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor. *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

### III.    Discussion

McKimmie seeks summary judgment on Brooks's nine claims against him. Six of the claims—false imprisonment, battery, malicious prosecution, false arrest, and the federal and state constitutional claims for false arrest—require proof that McKimmie lacked probable cause to arrest or charge Brooks. Three of the claims—one federal and two state constitutional claims for excessive force—require proof that McKimmie used excessive force during his arrest of Brooks.

McKimmie is not entitled to summary judgment on the state claims for false arrest, false imprisonment, and battery or the false arrest claims under 42 U.S.C. § 1983 and Articles 24 and 26 of the Maryland Declaration of Rights. When the evidence is viewed in the light most favorable to Brooks, a reasonable jury could find McKimmie lacked probable cause to arrest him. McKimmie is not entitled to summary judgment on the malicious prosecution claim because a reasonable jury could find that the charges were unsupported by probable cause and that

McKimmie acted maliciously. McKimmie is not entitled to summary judgment on the excessive force claims under 42 U.S.C. § 1983 and Articles 24 and 26 of the Maryland Declaration of Rights because there is a genuine dispute of material fact as to whether McKimmie used excessive force. Finally, on the current record, McKimmie is not entitled to immunity under the Maryland Tort Claims Act ("MTCA") on the state claims or qualified immunity on the federal claims.

### A. False Arrest, False Imprisonment, and Battery

Brooks's federal and state constitutional claims for false arrest and his state common law claims for false arrest, false imprisonment, and battery share a common question: Did McKimmie have probable cause to arrest Brooks? If there is no genuine dispute that McKimmie had probable cause, these claims fail as a matter of law. If there is a genuine dispute about whether McKimmie had probable cause, these claims go to a jury unless McKimmie can establish he is entitled to immunity as a matter of law.[1]

The Fourth Amendment protects citizens from "unreasonable searches and seizures." U.S. Const. amend. IV. "A seizure is unreasonable under the Fourth Amendment if it is not based on probable cause." *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019) (citing *Dunaway v. New York*, 442 U.S. 200, 213 (1979)). "Thus, '[i]f a person is arrested when no reasonable officer could believe . . . that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues.'" *Id.* (alterations in original) (quoting *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001)). Brooks's Article 24 and

---

[1] McKimmie does not argue that Brooks cannot prove the other elements of the federal and state constitutional claims for false arrest and the state claims for false arrest, false imprisonment, and battery. In addition, McKimmie does not specifically address in his summary judgment briefing Brooks's federal constitutional claim for false arrest in Count Nine. However, because this claim rises and falls with Brooks's parallel state constitutional claim for false arrest in Count Four, the Court addresses both claims.

Article 26 claims incorporate the same legal standard as his federal false arrest claim. *See Ross v. Early*, 899 F. Supp. 2d 415, 431 (D. Md. 2012).

The elements of false arrest and false imprisonment under Maryland law are: "(1) a deprivation of the liberty of another; (2) without consent; and (3) without legal justification." *Rovin v. State*, 321 A.3d 201, 222 (Md. 2024). A battery claim that is not based on excessive force (as here) "can only occur when there is no legal authority or justification for the arresting officer's actions." *Williams v. Prince George's County*, 685 A.2d 884, 898 (Md. App. Ct. 1996). Legal justification and probable cause are separate but often overlapping concepts in Maryland. As the Maryland Supreme Court has explained, "the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest." *Ashton v. Brown*, 660 A.2d 447, 472 (Md. 1995) (quoting *Great Atl. & Pac. Tea Co. v. Paul*, 261 A.2d 731, 738 (Md. 1970)). Thus, the federal and state constitutional claims for false arrest and the state claims for false arrest, false imprisonment, and battery require Brooks to prove that McKimmie did not have probable cause to arrest him.

McKimmie did not have a warrant to arrest Brooks for criminal trespass. To have legal justification for a warrantless arrest, an officer must have at least probable cause to believe that the suspect committed or is committing a crime. Md. Code Ann., Crim. Proc. § 2-202(b) ("A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime.").

"Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the

person to be arrested." *Elliott v. State*, 10 A.3d 761, 771 (Md. 2010) (quoting *Longshore v. State*, 924 A.2d 1129, 1137 (Md. 2007)). Probable cause is a "fluid concept" that "depends on the totality of the circumstances." *State v. Johnson*, 183 A.3d 119, 129 (Md. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983), and then quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)); *see also Nero v. Mosby*, 890 F.3d 106, 130 (4th Cir. 2018) ("Probable cause is 'a probability or substantial chance of criminal activity, not an actual showing of such activity,' and it is assessed based on the totality of the circumstances." (quoting *Gates*, 462 U.S. at 243 n.13)). "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

McKimmie claims that, when he arrested Brooks, he had probable cause to arrest him for two offenses: criminal trespass and disorderly conduct. The Court easily dispenses with the disorderly conduct justification. The basis for the disorderly conduct charge was Brooks's post-arrest conduct in the hotel hallway. McKimmie admitted that he did not arrest Brooks for disorderly conduct. *See* ECF 52-4, at 72:14–17 ("Q. Okay. There was no – you were not arresting him at that point for any disorderly conduct; is that right? A. Not at that point, no."). Instead, McKimmie testified that "the disorderly came into play" when the officers "had to carry him out of the hotel room [and] he was yelling and screaming." *Id.* at 72:18–22. Thus, the Court considers only whether McKimmie had probable cause to arrest Brooks for trespass when McKimmie handcuffed Brooks in his hotel room. *See Beasley v. Kelly*, Civ. No. DKC-10-0049, 2011 WL 4711910, at *5 (D. Md. Oct. 4, 2011) ("[L]egal justification must exist at the time that the deprivation of liberty occurs,

and it does not turn on developments subsequent to the deprivation of liberty."). The question, then, is whether a reasonably prudent officer would have thought he had probable cause to arrest Brooks for criminal trespass. *See Hupp*, 931 F.3d at 318.

Under Maryland law, "a person may not remain on private property . . . after having been notified by the owner or the owner's agent not to do so." Crim. Law § 6-403(b). The statute prohibits wanton entry onto property, and Maryland courts have suggested that a person commits criminal trespass if he remains on another's property wantonly. *See Md. State Dep't of Personnel v. Sealing*, 471 A.2d 693, 699 (Md. 1984) ("We see no reason why the refusal of these appellants to leave the premises after having been requested to do so was not wanton in that their conduct was in utter disregard for the rights of others." (quoting *Griffin v. State*, 171 A.2d 717, 720 (Md. 1961), *rev'd on other grounds*, 371 U.S. 130 (1964))); *Robbins v. State*, No. 1806, Sept. Term 2015, 2017 WL 3633290, at *5 (Md. App. Ct. Aug. 24, 2017) (finding that defendant remained on private property wantonly). Under Maryland law, a person acts wantonly by refusing to leave after being instructed to do so. *See Thaler v. Donald J. Trump for President, Inc.*, 304 F. Supp. 3d 473, 479 (D. Md. 2018) ("Defendant asked Plaintiff to leave the rally that it was conducting at the high school, and he refused to leave. This refusal to leave the rally constituted wanton conduct that violated Maryland's trespass code.").

The Court starts with facts that are not genuinely disputed. During McKimmie's first trip to Brooks's hotel room, McKimmie told Brooks to stay there. Several minutes later, McKimmie returned to Brooks's room and told Brooks the opposite: that Lowery now wanted him to leave the hotel. Brooks responded that Lowery had not asked him to leave the hotel or given him a refund.[2]

---

[2] The only evidence that Brooks cites in support of this fact is his interrogatory answer, ECF 56-1, at 7. Brooks does not cite his deposition testimony in which he denied telling the officers that Hilton had not asked him to leave and had not given him a refund. *See* ECF 52-2, at 144:18–145:2.

McKimmie then told Brooks that if he did not open the door, Brooks would be arrested for trespassing. Thus, there is no genuine dispute of material fact that McKimmie notified Brooks that he was no longer permitted to remain at the Hilton and that if Brooks did not open the door, the officers would arrest him for trespassing.[3]

But there is a genuine dispute of material fact about whether Brooks remained on the property after McKimmie told him he had to leave. According to McKimmie's statement of probable cause, McKimmie "explained the situation and the consequences to [Brooks] several times through the doorway and he still refused to open the door." ECF 56-6, at 3. McKimmie testified that he "was knocking on the door, trying to get [Brooks] to listen to us, asking him, explaining the situation to him, like, look, just get your stuff go. If not, then you've been asked to leave by the hotel manager." ECF 52-4, at 52:17–21. On McKimmie's account, Brooks did not cooperate. He was "just shouting" and repeatedly yelled "f*** you." *Id.* at 53:6–8. After another officer arrived, the officers "tried a couple more times" to engage with Brooks, but Brooks "was

---

In his briefing, Brooks confirms that he did, in fact, tell McKimmie he had not been asked to leave by Hilton and had not been given a refund. *See* ECF 56, at 15 ("After having told Mr. Brooks to specifically stay in his room, Deputy McKimmie returned shortly later for a second interaction and stated the exact opposite. Mr. Brooks responded that he had not been asked to leave by the Hilton— which was true, as Mr. Lowery never made that request to him—and noted that he had not received any refund for the hotel room he booked and paid for."); *id.* at 7 (citing Brooks's interrogatory answer). Thus, there is no genuine dispute of material fact over how Brooks responded to McKimmie's initial order to leave the hotel.

[3] When Lowery instructed McKimmie to remove Brooks from the hotel, he effectively made McKimmie an agent of Hilton for purposes of Crim. Law § 6-403(b). Brooks does not contest that McKimmie was acting as Hilton's agent when McKimmie told him that Lowery wanted him to leave the hotel. This is wise. This court has recognized that a business owner may establish an agency relationship with a police officer by instructing the officer to notify a customer that he is no longer welcome on the property. *See Sykes v. Wicomico County*, No. CCB-05-2846, 2007 WL 1073607, at *5 (D. Md. Mar. 30, 2007) (finding that officers were acting within the scope of an agency relationship when, in response to owner's request that officers remove loiterers from her property, they gave notice to loiterers "that they had no legitimate purpose on the premises" and removed them).

still not willing to have a conversation with" the officers. *Id.* at 60:12–14. At that point, the officers decided "to go in the room and try to talk to [Brooks]." *Id.* at 60:12–16.

Brooks has a different recollection. As Brooks recalls the events, he did not refuse to open the door at all. When McKimmie told him that if he did not open the door he would be arrested for trespassing, Brooks recalls that he responded that he would open the door and that when he tried to unlatch it, the officers immediately rushed into the room, tackled him, and handcuffed him. ECF 52-2, at 145:11–16 ("It was, [']You be arrested for trespassing. You open the door.['] [']Okay. Give me a second. I'll open it.['] As soon as I open it, boom, attack, grabbed me up . . . [.]"); *see also id.* at 144:9–10 ("[G]ive me a second. I need to unlatch the door.").

If a rational finder of fact believed Brooks's account, they could find that no reasonable officer would believe Brooks refused to leave the property and that there was no probable cause to arrest him for trespassing. Whether Brooks refused to leave the hotel after he was ordered to do so and whether there was probable cause to arrest him for trespassing are genuinely disputed material facts.

Contrast these facts with *Jones v. Ashford*, Civ. No. TDC-14-3639, 2017 WL 221783, at *5 (D. Md. Jan. 18, 2017), where the court found, as a matter of law, that a police officer had probable cause to arrest for trespassing when the plaintiff did not leave after the officer told him multiple times to leave the mall and threatened him with arrest and the mall's security officer and a store employee also told him to leave. Here, by contrast, there is evidence that Brooks tried to comply with McKimmie's order to leave the hotel and that McKimmie arrested Brooks before he could leave. Based on the record evidence, there is a genuine dispute of material fact about whether McKimmie had probable cause to arrest Brooks for trespassing.

### B. Malicious Prosecution

Brooks claims he was maliciously prosecuted for these crimes. The elements of a malicious prosecution claim are: "1) a criminal proceeding instituted or continued by the defendant against the plaintiff; 2) without probable cause; 3) with malice, or with a motive other than to bring the offender to justice; and 4) termination of the proceedings in favor of the plaintiff." *Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000). There is no dispute that criminal proceedings were instituted against Brooks by McKimmie and that the proceedings terminated in Brooks's favor. The disputes are whether the charges against Brooks lacked probable cause and whether McKimmie acted with malice.

Brooks was charged with trespassing and disorderly conduct. The Court has found there is a genuine dispute of material fact about whether there was probable cause to arrest him for criminal trespass. The Court also finds there is a genuine dispute of material fact about whether there was probable cause to charge Brooks with disorderly conduct.

Under Maryland law, a person "may not, by making an unreasonably loud noise, willfully disturb the peace of another: (i) on the other's land or premises; (ii) in a public place; or (iii) on a public conveyance." Crim. Law § 10-201(c)(5). McKimmie claims that Brooks willfully disturbed the peace of the hotel's other guests when he yelled in the hallway as the officers escorted him to the police cruiser. Brooks admits that he was yelling "[t]he whole way" from his room to the police cruiser. *See* ECF 52-2, at 161:21–162:1. In McKimmie's view, "[i]t is . . . undisputed that [Brooks] yelled throughout the time he was being carried from his room to the cruiser outside, and thus there was probable cause to charge him with disorderly conduct for yelling in a hotel at 2:30 in the morning." ECF 52-1, at 12.

The undisputed fact that Brooks was yelling in the hotel hallway does not necessarily mean there was probable cause to arrest him for disorderly conduct. First, when a person "is acting in a lawful manner . . . and is the object of an unlawful police order," as Brooks claims he was, "it is not usually a criminal violation for such a person to verbally protest a police officer's insistence upon submission to such an order." *See Diehl v. State*, 451 A.2d 115, 122 (Md. 1982); *see also State v. Wiegmann*, 714 A.2d 841, 849 (Md. 1998) (recognizing "the long-standing common law rule that 'one illegally arrested may use any reasonable means to effect his escape, even to the extent of using such force as is reasonably necessary'" (quoting *Sugarman v. State*, 195 A. 324, 326 (Md. 1937))); *Att'y Grievance Comm'n v. Mahone*, 76 A.3d 1198, 1211 (Md. 2013) ("It is well settled that a person has the right to resist an unlawful arrest."). Second, even if the arrest was lawful, the Maryland Supreme Court has indicated that any arrest for disorderly conduct based on the volume of a person's speech must be "preceded by a 'prior warning by police authority' that 'further communication at the offensive volume level may subject the individual to prosecution' and 'a complaint from an affected citizen upon the basis of which the officer reasonably believes that the statute has been violated.'" *Garcia v. Montgomery County*, 145 F. Supp. 3d 492, 518 (D. Md. 2015) (quoting *Eanes v. State*, 569 A.2d 604, 617–18 (Md. 1990)); *see also Baynard v. State*, 569 A.2d 652, 656 (Md. 1990) (finding that defendant did not commit disorderly conduct under predecessor statute when the court "d[id] not even know that her speech or actions were disturbing anybody").

The Court cannot conclude as a matter of law that McKimmie had probable cause to arrest Brooks for disorderly conduct. On the record before the Court, there is a genuine dispute of material fact about whether McKimmie had probable cause to arrest Brooks in his hotel room for trespassing and thus whether Brooks was protesting an unlawful arrest when he was yelling in the

hallway after his arrest. And although McKimmie testified that he told Brooks to "stop yelling," ECF 52-4, at 83:3, there is no evidence that McKimmie warned Brooks that continuing to yell at the offensive volume level may subject him to prosecution. Nor is there any evidence that McKimmie or the other officers received any "complaint from an affected citizen." *See Garcia*, 145 F. Supp. 3d at 518. McKimmie admitted that he did not "see anyone, any other patrons of the Hilton Garden Inn disturbed or bothered by Mr. Brooks yelling." ECF 52-4, at 84:2–5. He also testified that he had no recollection "of anyone coming out of any of the rooms to see what was happening." *Id.* at 117:7–10.[4] On the current record, there is a genuine dispute about whether McKimmie had probable cause to charge Brooks with disorderly conduct when McKimmie did not warn him that he could be charged with the crime if he did not lower his voice and no one complained about Brooks's yelling.

Whether there was probable cause for either of the crimes McKimmie charged Brooks with is genuinely in dispute.

There also is a genuine dispute of fact about whether McKimmie acted with malice when he charged Brooks with trespassing and disorderly conduct. "The 'malice' required for malicious prosecution consists of a wrongful or improper motive in initiating legal proceedings." *Alvarez v. Montgomery County*, 147 F.3d 354, 360 (4th Cir. 1998) (quoting *Montgomery Ward v. Wilson*, 664 A.2d 916, 924 (Md. 1995)). "[T]he 'malice' element of malicious prosecution may be inferred from a lack of probable cause." *Montgomery Ward*, 664 A.2d at 924. Because there is a genuine dispute about whether McKimmie had probable cause to arrest and charge Brooks, there is a genuine dispute about whether McKimmie acted with malice. *See Okwa v. Harper*, 757 A.2d 118,

---

[4] McKimmie points to Lowery's testimony that the hotel manager received one complaint about the noise the following day. *See* ECF 57, at 4 (citing ECF 52-3, at 116:8–21). McKimmie does not claim that he knew about this complaint when he charged Brooks with disorderly conduct.

133 (Md. 2000) (finding genuine dispute of material fact as to malice when plaintiff's arrest was not supported by probable cause).

### C. Excessive Force

Brooks asserts federal and state constitutional claims against McKimmie for excessive use of force during the arrest. Each claim requires Brooks to submit evidence that the force McKimmie used was objectively unreasonable. Brooks has carried his burden.

The Fourth Amendment prohibits law enforcement officers from using excessive force while arresting a suspect. *See Doriety ex rel. Crenshaw v. Sletten*, 109 F.4th 670, 675 (4th Cir. 2024). An officer's use of force is excessive when it is not "'objective[ly]' reasonable." *Id.* (alteration in original) (quoting *Lewis v. Caraballo*, 98 F.4th 521, 531 (4th Cir. 2024)); *see also Saucier v. Katz*, 533 U.S. 194, 207 (2001) ("Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.").

In determining reasonableness, the "overarching inquiry is whether the force that was used was proportional under the circumstances." *Nazario v. Gutierrez*, 103 F.4th 213, 234 (4th Cir. 2024). To make this determination, courts consider the force that was used and three factors—the so-called "*Graham* factors": "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to flee." *Lewis*, 98 F.4th at 531 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts in the Fourth Circuit also consider "the extent of the plaintiff's injuries." *Nazario*, 103 F.4th at 234 (quoting *Hupp*, 931 F.3d at 322). "The court's focus should be on the circumstances at the moment the force was used and on the fact that officers . . . are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

Brooks claims that McKimmie used force when McKimmie "smush[ed] [his] face into the hard floor" while handcuffing him. ECF 52-2, at 158:1–9.[5] Brooks admits that he does not know which officer smushed his face into the floor because he was lying prone on the ground when it happened and he could not see who did it. But Brooks believes it was "most likely" McKimmie. *Id.* at 158:9. McKimmie admits he placed handcuffs on Brooks while Brooks was face down on the floor, but he denies that he smushed Brooks's face into the ground in the process of handcuffing him. *See* ECF 52-4, at 75:18–76:6 (statement of McKimmie that he applied handcuffs to Brooks while Ryan and Keyes held Brooks down by placing their hands on his back and shoulders); ECF 52-1, at 16 (denying that McKimmie smushed Brooks's face into the floor). McKimmie argues that the only force he used was the force necessary to handcuff Brooks and that "handcuffing pursuant to a lawful arrest cannot be excessive force." ECF 52-1, at 16. McKimmie insists his "mere application of handcuffs cannot plausibly be viewed as excessive[.]" ECF 57, at 7. But Brooks does not agree that "Deputy McKimmie did nothing more than lean over the bed and apply handcuffs to [his] wrists." *See* ECF 52-1, at 15. Brooks claims that McKimmie "push[ed] [his] head into the ground." ECF 52-2, at 156:6–7. On a summary judgment motion, the Court must view the disputed facts in Brooks's favor. *See Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011). Thus, there is a genuine dispute over whether Brooks's face was smushed into the ground while he was being handcuffed and whether McKimmie was the culprit. Viewing the evidence in the light most favorable to Brooks, the Court finds that a reasonable juror could conclude that Brooks's face was smushed into the ground during the handcuffing and that McKimmie was the officer who did it. *See Slayton v. City of River Rouge*, 515 F. Supp. 3d 695,

---

[5] Brooks does not claim that the officers used excessive force when they opened the door and caused Brooks to fall to the ground. The alleged excessive force is only the "face smushing" by McKimmie when he handcuffed Brooks.

706 (E.D. Mich. 2021) (finding dispute of fact about which officer committed which act of excessive force because it was nighttime, the plaintiff "alleges he was handcuffed face-down on the ground when he was kicked by the officers," and it was reasonable for him not to know which of the few officers attacked him); *see also Okwa*, 757 A.2d at 139 (allowing excessive force claim to proceed against both officers when the plaintiff stated that "he was forcibly put to the ground and struck in the head and neck *by either* Officer Harper or Gernert" (emphasis added)).

The Court now considers the *Graham* factors, each of which favors Brooks.

The first factor is the severity of the crime. McKimmie arrested Brooks for trespassing. Using force to effect an arrest for a nonviolent misdemeanor offense generally is not necessary. *See Nazario*, 103 F.4th at 234 (finding the plaintiff's misdemeanor obstruction of justice offense "d[id] not involve violence, nor d[id] it pose sufficient risk of danger to either the public or the police officers to weigh in favor of using significant force"); *Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003) ("[W]hen the 'offense was a minor one,' we have found that the first *Graham* factor weighed in plaintiff's favor and upheld the denial of summary judgment to the defendant police officer." (quoting *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994))). And the trespassing, if it occurred, was in a hotel room that Brooks had rented. Moreover, there is a genuine dispute over whether Brooks was, in fact, trespassing. If there was no probable cause to arrest Brooks for trespassing, this factor weighs strongly in his favor. *See Jones*, 325 F.3d at 528 (finding first factor "clearly weigh[ed] in [plaintiff's] favor" when plaintiff "committed no crime" (emphasis omitted)). Even if there was probable cause to arrest Brooks for the minor crime of trespassing, the first *Graham* factor weighs in favor of Brooks.

The second factor—the threat posed to the officers or others—also weighs in Brooks's favor. There is no evidence that McKimmie believed that Brooks posed a danger to him or the

other officers. Though McKimmie testified that Ryan told him after the arrest that Brooks had assumed an "aggressive stance," ECF 52-4, at 71:10–12, there is no evidence that McKimmie thought that Brooks had taken "an aggressive stance" towards the officers or posed a danger to them. Also, Brooks was pinned to the ground, facedown, by two officers when McKimmie handcuffed him. *See Lewis*, 98 F.4th at 532–33 (finding second factor weighed in the plaintiff's favor when he "was under the weight of the two, larger trained officers and was at least partially subdued" when the officers used force (internal quotation omitted)). This factor weighs in Brooks's favor.

The third factor—any effort to resist arrest or flee—weighs in Brooks's favor too. Brooks testified that he did not resist arrest. *See* ECF 52-2, at 150:14–16 ("I never fought back either. I never tried to resist arrest."). He "basically played dead" and "didn't move a limb." *Id.* at 156:22–157:4. McKimmie does not offer any evidence that Brooks resisted arrest. This and the other two *Graham* factors favor Brooks.

Finally, Brooks did not suffer any injuries. This favors McKimmie. However, a police officer is not absolved of liability because "their conduct, however unreasonable, only results in de minimis injuries." *Smith v. Murphy*, 634 F. App'x 914, 917 (4th Cir. 2015); *see also Bibum v. Prince George's County*, 85 F. Supp. 2d 557, 562 (D. Md. 2000) ("The court rejects Officer Zelaya's argument that he is entitled to summary judgment on the Fourth Amendment excessive force claim because the physical injuries Bibum complains of were *de minimis.* As explained below, the *de minimis* injury rule is inapplicable to Fourth Amendment excessive force claims.").

When the Court views the facts in the light most favorable to Brooks and considers the *Graham* factors and Brooks's injuries, a reasonable jury could find that the use of force was not proportional or objectively reasonable under the "totality of the circumstances." *See Graham*, 490

U.S. at 396. If Brooks had committed no crime, did not pose a threat to the officers, was not resisting arrest, and was pinned to the ground facedown by two other officers, a jury could find that it would not be reasonable for a police officer to smush Brooks's face into the ground while the officer handcuffed him.

Though the Fourth Circuit has recognized than an officer may use some minimal force while effectuating an arrest, *see, e.g., Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017), those cases are distinguishable. In *Pegg*, the Fourth Circuit held than an officer's use of force was reasonable when he "briskly, but safely" took the plaintiff, who resisted the officer's attempt to secure his hands behind his back, to the ground—"a simple maneuver to ensure [the plaintiff's] compliance." 845 F.3d at 120 & n.5. The court held that, as a general rule, "[a]n efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force." *Id.* The Fourth Circuit reaffirmed *Pegg* recently in *Somers v. Devine*, No. 24-1511, 2025 WL 889762 (4th Cir. Mar. 24, 2025). In *Somers*, an officer lifted the plaintiff out of her chair when she refused to leave. *Id.* at *6. The officer then rolled the plaintiff onto her chest after she refused his orders to do so. *Id.* The officer then applied enough pressure to "keep her still while handcuffing her, and he loosened up in under a minute." *Id.* The Fourth Circuit concluded that "the use of force was minimal and was made necessary by [the plaintiff's] resistance." *Id.* The officer's use of force was "an example of an appropriate, proportional response to an individual resisting lawful arrest and lawful orders to remain masked in accordance with Maryland law." *Id.* Summary judgment for the officer was affirmed. *Id.*

Other courts also have found minimal force used to effectuate a lawful arrest or stop was reasonable when the person resisted police commands. *See Moore v. Peitzmeier*, Civ. No. TDC-18-2151, 2020 WL 94467, at *8 (D. Md. Jan. 7, 2020) (finding officer's use of force reasonable

when officer held the plaintiff's neck while other officers were handcuffing him, after the plaintiff did not present his arms to be handcuffed, and officer's body-worn camera footage "d[id] not show anyone pressing [the plaintiff's] head into the ground"); *Neal v. Caplan*, Civ. No. 22-1919-BAH, 2025 WL 608191, at *8 (D. Md. Feb. 25, 2025) (finding officer's use of force reasonable when officer twisted the resisting suspect's arm behind his back to handcuff him and the suspect "was actively resisting and suffered only de minimis injury").

The amount of force deemed reasonable in *Pegg*, *Somers*, *Moore*, and *Neal* is similar to the amount of force at issue here. That is where the similarities end. In those cases, the suspects had resisted arrest. Here, there is no evidence that Brooks resisted arrest. In those cases, the arrests were supported by probable cause. Here, probable cause for arrest is disputed, a factor that "weigh[s] heavily in favor of [Brooks's] excessive force claim." *See Hupp*, 931 F.3d at 322. On this record, a reasonable jury could find that smushing Brooks's face into the floor while handcuffing him was excessive. *See Krell v. Braightmeyer*, 828 F. App'x 155, 158 (4th Cir. 2020) (distinguishing *Pegg* and affirming denial of summary judgment on excessive force claim when "a jury could reasonably find that [defendant] unnecessarily slammed [plaintiff's] face into the floor" even though plaintiff "suffered only de minimis injuries").

For the same reasons, there also is a dispute of material fact as to whether McKimmie used excessive force in violation of the Maryland Declaration of Rights. Excessive force claims under the Maryland Declaration of Rights are judged under the same standard as Fourth Amendment claims. *See Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010); *Lewis*, 98 F.4th at 530 n.4 ("We analyze Articles 24 and 26 under the same standard as the

Fourteenth and Fourth Amendments, respectively.").[6] Because a reasonable jury could find McKimmie's use of force was unreasonable for purposes of Brooks's Fourth Amendment excessive force claim, the same jury could find that the use of force was unreasonable for purposes of Brooks's parallel state constitutional claims.

### D.  Immunity

That McKimmie may have violated Brooks's rights is not the end of the story. McKimmie argues that he is entitled to qualified immunity on the federal claims and that he is entitled to immunity under the MTCA on the state claims.

### a.  Qualified Immunity

The defense of qualified immunity shields public officials from civil liability unless they violated a "statutory or constitutional right that was clearly established at the time of the challenged conduct." *Lewis*, 98 F.4th at 530 (quoting *Carroll v. Carman*, 574 U.S. 13, 16 (2014)). To defeat qualified immunity, the record must show that (1) McKimmie violated Brooks's constitutional right and (2) that right was "clearly established" when the violation occurred. *Id.* "The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022).

---

[6] Other judges in this district have held that an excessive force claim outside of pre-trial detention must be raised under Article 26, not Article 24. *See, e.g.*, *Graham v. Maryland*, 738 F. Supp. 3d 644, 654–56 (D. Md. 2024); *Barnes v. Montgomery County*, 798 F. Supp. 2d 688, 700 (D. Md. 2011) ("Article 24 of the Maryland Constitution is not the proper vehicle under which to bring an excessive force claim arising out of an arrest."); *Nicholson v. Balt. Police Dep't*, Civ. No. DKC-20-3146, 2023 WL 4549741, at *8 (D. Md. July 14, 2023) (holding that a Maryland excessive force claim "can only be brought under Article 26—the Fourth Amendment equivalent—and not Article 24"). However, neither Brooks nor McKimmie addresses the distinction between Article 24 and Article 26. The Court need not decide the issue because whether the excessive force claim should be brought under Article 26 or Article 24, the claim survives summary judgment.

"A right is clearly established if, at the time of the alleged offense, 'the contours of the right allegedly violated were sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Lewis*, 98 F.4th at 534 (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). To determine whether an officer was on notice, "we first look to cases from the Supreme Court, [the United States Court of Appeals for the Fourth Circuit], or the highest court of the state in which the action arose." *Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020). "In the absence of 'directly on-point, binding authority,' courts may also consider whether 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Id.* (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017)). The case need not be an exact factual match to an earlier case. *See Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019) ("In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two."). Still, courts should take care "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "Instead, [a court] must identify the specific right the plaintiff alleges was infringed at a 'high level of particularity.'" *Atkinson v. Godfrey*, 100 F.4th 498, 505 (4th Cir. 2024) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir. 1999)). And "[a]lthough a case directly on point is not required, existing precedent 'must have placed the statutory or constitutional question beyond debate.'" *Id.* at 505–06 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)).

Brooks raises two federal claims under § 1983: a false arrest claim and an excessive force claim.

As to his false arrest claim, Brooks had a right to be free from unlawful arrest. "[W]hether a plaintiff's right to be free from arrest is clearly established turns not on 'whether there actually

was probable cause . . . but whether an objective law officer could reasonably have believed probable cause to exist.'" *Thurston v. Frye*, 99 F.4th 665, 676 (4th Cir. 2024) (quoting *Gomez v. Atkins*, 296 F.3d 253, 261–62 (4th Cir. 2002)). As the Court has explained, if Brooks was attempting to comply with McKimmie's demand to open the door and he told McKimmie that he would open the door, a police officer would not reasonably believe he had probable cause to arrest Brooks for trespassing. Brooks had a clearly established right to be free from arrest under these circumstances. McKimmie has not established he is entitled to qualified immunity on Brooks's Fourth Amendment false arrest claim.

Nor is McKimmie entitled to qualified immunity on Brooks's Fourth Amendment excessive force claim. Brooks has a right to be free from "unnecessary, gratuitous, and disproportionate force [used] to seize a secured, unarmed citizen." *See Jones*, 325 F.3d at 532. If McKimmie smushed Brooks's face into the floor in the process of handcuffing Brooks for trespass, a nonviolent misdemeanor, when Brooks did not pose a threat to anyone and was not resisting arrest, McKimmie violated Brooks's Fourth Amendment right.

Brooks's right was clearly established when McKimmie used force. Fourth Circuit caselaw put McKimmie on notice that his use of force violated Brooks's clearly established right. In *Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993) (per curiam), the Fourth Circuit held that it was clearly established that once a suspect, such as the 100-pound woman in *Kane*, is pinned to the ground, the officer should not use additional force to push her against the pavement—force that in *Kane* cracked the suspect's teeth. Similarly, in *Valladares v. Cordero*, 552 F.3d 384, 390–91 (4th Cir. 2009), the Fourth Circuit found it clearly established that an officer could not use "unnecessary, gratuitous, and disproportionate" force after the officer had the plaintiff "under [his] full control." And in *Bailey v. Kennedy*, 349 F.3d 731, 745 (4th Cir. 2003), it was clearly established

that the officers "were not entitled to use force after [the plaintiff] was secured face down on the floor in handcuffs and leg restraints," especially because the plaintiff "had committed no crime" and the officers "had no reason to believe he was a danger to himself or others."

*Kane*, *Valladares*, and *Bailey* involved more extreme uses of force than the force at issue here. But the same clearly established principle that applied in those cases applies here: it is objectively unreasonable for a police officer to apply additional force once an unarmed suspect is secured. *Accord Jones*, 325 F.3d at 531–32 (concluding an officer "using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do[es] not act in an objectively reasonable manner and, thus, [is] not entitled to qualified immunity"); *Krell*, 828 F. App'x at 158 (finding violation of clearly established right when officers tackled plaintiff and "smashed his face into the tile floor, even though [he] neither resisted arrest nor posed a physical threat to the officers" because, at the time of plaintiff's arrest, "the law clearly prohibited Defendants from 'using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen'" (quoting *Jones*, 325 F.3d at 532)). McKimmie was on notice that pushing Brooks's face into the floor while he handcuffed him, when Brooks was pinned to the ground by two officers and not armed or resisting arrest, is an excessive use of force. At this stage of the litigation, McKimmie is not entitled to qualified immunity.

### b. MTCA Immunity

Lastly, McKimmie asserts that he is immune from Brooks's state law claims under the Maryland Tort Claims Act. The MTCA immunizes state personnel, including deputy sheriffs, from suit for tortious conduct committed within the scope of their duties "without malice or gross

negligence." Md. Code Ann., State Gov't § 12-105; Md. Code Ann., Cts & Jud. Proc. § 5-522(b).[7]

Malice refers to "actual malice," which is "conduct 'characterized by evil or wrongful motive,

intent to injure, knowing and deliberate wrongdoing, ill-will, or fraud.'" *Lee v. Cline*, 863 A.2d

297, 311 (Md. 2004) (quoting *Shoemaker v. Smith*, 725 A.2d 549, 559 (Md. 1999)); *see also Nero*,

890 F.3d at 127 ("To establish malice, a plaintiff must show that the government official

'intentionally performed an act without legal justification or excuse, but with an evil or rancorous

motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'"

(quoting *Bord v. Baltimore County*, 104 A.3d 948, 964 (Md. 2014))). An officer acts with gross

negligence when he "intentional[ly] fail[s] to perform a manifest duty in reckless disregard of the

consequences as affecting the life or property of another" and his actions "also impl[y] a

thoughtless disregard of the consequences without the exertion of any effort to avoid them." *E.W.*

*ex rel. T.W. v. Dolgos*, 884 F.3d 172, 187 (4th Cir. 2018) (quoting *Cooper v. Rodriguez*, 118 A.3d

829, 845–46 (Md. 2015)). Whether an officer acted with malice or gross negligence is typically a

question for a jury but "can be determined as a matter of law when the facts clearly show that no

reasonable jury could find that the defendant's actions" meet the standard. *E.W.*, 884 F.3d at 187;

---

[7] Brooks argues that MTCA immunity does not apply to his state constitutional claims in Counts Three and Four. Brooks is mistaken. The Maryland Supreme Court has held that MTCA immunity, "if otherwise applicable, encompasses constitutional torts and intentional torts." *Lee v. Cline*, 863 A.2d 297, 310 (Md. 2004); *see Newell v. Runnels*, 967 A.2d 729, 766 n.28 (Md. 2009) (noting that "the MTCA does not distinguish between constitutional torts and common law torts"); *Ford v. Balt. Cty. Sheriff's Off.*, 814 A.2d 127, 141 (Md. App. Ct. 2022) ("Of note, the [MTCA's] waiver of immunity does not carve out any exception for State constitutional torts . . . . 'The MTCA makes no distinction between intentional, constitutional, or other torts . . . .'" (quoting *Thomas v. City of Annapolis*, 688 A.2d 448, 453 n.3 (Md. 1997))). The Fourth Circuit, too, has analyzed whether a Maryland state officer is entitled to MTCA immunity on claims under Articles 24 and 26. *See Lewis*, 98 F.4th at 537–38; *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 187–88 (4th Cir. 2018); *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (en banc). Thus, McKimmie may raise MTCA immunity with respect to Brooks's claims under Articles 24 and 26.

*see also Williams v. Prince George's County*, 685 A.2d 884, 896 (Md. 1996) (holding that summary judgment was proper when "there was not a scintilla of evidence that the arresting officers harbored ill will or an evil motive toward appellant").

The Court finds a genuine dispute of material fact as to whether McKimmie acted maliciously when he arrested and charged Brooks. McKimmie's and Brooks's accounts of the incident differ. If a jury believed Brooks's account—that McKimmie arrested him for trespassing without probable cause—the jury could find that McKimmie "performed an act without legal justification or excuse, [and] with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *See Thacker v. City of Hyattsville*, 762 A.2d 172, 189 (Md. App. Ct. 2000) (quoting *Shoemaker*, 725 A.2d at 560). Also, Brooks testified that McKimmie gratuitously pushed his face into the floor after he was subdued by two officers and was not resisting arrest. That, too, could be evidence of malice. *See Sherrill v. Cunningham*, Civ. No. JKB-18-476, 2018 WL 3533550, at *8 (D. Md. July 23, 2018) (finding that evidence that police officer used force against the plaintiff and ransacked her car, even though he could see that she was "compliant and non-threatening" created inference of malice). In addition, McKimmie wrote in his statement of probable cause that Brooks "began to shout in a very loud tone obscenities and racial slurs." ECF 56-6, at 2. McKimmie testified that the "racial slurs" referred to what Brooks said to his friend on the phone while Brooks was inside his hotel room and the officers were outside his door: "I got . . . two fat, white cops here." ECF 52-4, at 43:13–16, 45:17–46:1. When asked how that comment was a racial slur, McKimmie testified, "The fact that he had to associate us being white with anything. I don't – I'm not sure why that had to be said." *Id.* at 46:2–5. Though McKimmie testified that he was "not really" upset by the statement, *id.* at 46:10–11, a reasonable jury could conclude that the characterization of the statement as a "racial slur" and its inclusion in

McKimmie's statement of probable cause suggest McKimmie harbored animus towards Brooks. *See Thacker*, 762 A.2d at 192 (finding a "jury could reasonably infer from the evidence that [defendant] acted out of racial animus by making an arguably quick and unlawful arrest on the basis of his anger and hostility toward [plaintiff's] perceived racial prejudice and discriminatory conduct").

Evidence of malice, while not overwhelming, exists. The Fourth Circuit and Maryland courts have repeatedly admonished against resolving MTCA immunity on summary judgment. *See id.* at 189 ("On a motion for summary judgment, inferences arising from the evidence presented by an arrestee challenging a claim of qualified immunity must be drawn in favor of the arrestee, and against summary judgment. . . . [T]he Court of Appeals has recognized that claims of [MTCA] immunity usually present questions for the fact-finder."); *Lewis*, 98 F.4th at 537 ("Unlike the use-of-force analysis, the question of whether an officer acted with gross negligence or malice is 'subjective,' and thus is 'generally a question for the jury.'" (quoting *Henry*, 652 F.3d at 536)). There is a genuine dispute of material fact as to whether McKimmie acted with malice. McKimmie has not established that he is entitled to immunity under the MTCA.

V.    **Conclusion**

McKimmie's motion for summary judgment is denied. A separate Order follows.

Date: April 4, 2025
_____

_____
Deborah L. Boardman
United States District Judge